Nicholas J. LARIONOFF, Jr., et al.

v.

The UNITED STATES of America et al., Appellants.

Nicholas J. LARIONOFF, Jr., et al., Appellants,

v.

The UNITED STATES of America et al.

Nos. 74–1211, 74–1212.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1975.

Decided Feb. 17, 1976.

Rehearing Denied April 21 and April 29, 1976.

---

Stephen Daniel Keeffe, Washington, D. C., for appellants in No. 74–1212 and appellees in No. 74–1211.

Neil H. Koslowe, Atty., Dept. of Justice, Washington, D. C., with whom Carla A. Hills, Asst. Atty. Gen., New York City, at the time the brief was filed, Earl J. Silbert, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants in No. 74–1211 and appellees in No. 74–1212. Morton Hollander, Atty., Dept. of Justice and Michael A. Katz, Asst. U. S. Atty., Washington, D. C., also entered appearances for appellants in No. 74–1211 and appellees in No. 74–1212.

Before RICHARD T: RIVES,* Senior Circuit Judge for the Fifth Circuit, WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

Congress has been continuously concerned from its inception with the problem of maintaining an adequately manned military establishment for the protection of our national interests. Although one controversial response to that problem has been the operation of a system of compulsory military service, Congress has also—especially in recent years—attempted to provide a sufficient monetary incentive to attract men and women to careers in the military. One approach that has frequently been chosen by Congress is the award of a monetary bonus—recently labeled a "Regular Reenlistment Bonus"—to enlisted personnel who reenlist or extend the period of their obligated service.[1] Since 1965, Congress has also provided an additional reenlistment bonus—a "Variable Reenlistment Bonus"—to enlisted personnel whose skills are in critically short supply.[2] That Variable Reenlistment Bonus (VRB), which is available to enlisted personnel eligible for a Regular

---

* Sitting by designation pursuant to Title 28, U.S. Code Section 294(d).

1. See text and note at note 16 *infra*.
2. See text and notes at notes 18–22 *infra*.

Reenlistment Bonus (RRB), is set by regulation at a multiple of the RRB.[3]

The seven named plaintiffs who filed this class suit in the District Court are enlisted personnel in the United States Navy who claim that they are entitled by contract or under the doctrine of promissory estoppel to receive VRBs equal to four times the amount of their respective RRBs. We conclude that the District Court properly asserted jurisdiction pursuant to 28 U.S.C. § 1346(a)(2),[4] and, for the reasons set forth below, we affirm the judgment of the District Court ordering payment of VRBs to the named plaintiffs.[5] We affirm the District Court's order certifying the suit as a class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure and awarding attorneys' fees of $14,729. And finally, we remand the case to the District Court for further proceedings concerning an award of attorneys' fees for the efforts of counsel directed to this appeal.

## I. FACTUAL BACKGROUND

On June 23, 1969 plaintiff Larionoff enlisted in the United States Navy for four years. Shortly thereafter, he underwent a series of tests and interviews to determine his appropriate duty assignment. During the course of those interviews with Navy personnel, Larionoff decided to participate in the Advanced Electronic Field (AEF) training program, successful completion of which would place him in the Communications Technician-Maintenance (CTM) service rating. At the time he decided to enter the AEF program, Larionoff was aware that the CTM rating was classified as a "critical military skill" qualifying for a Var-

iable Reenlistment Bonus equal to four times the amount of an enlisted member's Regular Reenlistment Bonus.[6]

Under applicable Navy regulations, the AEF program involved a six year service obligation, and plaintiff Larionoff consequently executed the following "Agreement to Extend Enlistment":

> I NICHOLAS JOHN LARIONOFF JR., B 17 77 88, SNJEF, USN having enlisted in the Navy of the United States on 23 JUN 69 for FOUR years, *in consideration of the pay, allowances, and benefits which will accrue to me during the continuances of my service,* voluntarily agree to extend my enlistment as authorized by Section 5539, of Title 10, United States Code, and the regulations issued pursuant thereto. I voluntarily agree to extend my enlistment for a period of TWO years from the date of expiration thereof, subject to the provisions and obligations of my said contract of enlistment of which this, my voluntary agreement, shall form a part. REASON FOR EXTENSION: "Training (Advanced Electronics Field (AEF) Program—BuPers 1tr Pers-B2131-gn-56 of 31 August 1966). I understand this extension agreement becomes binding upon execution and thereafter may not be cancelled except as set forth in BUPERS Manual, Article C–1407."

App. at 134 (emphasis added). On that same day, plaintiff Larionoff executed a document requesting assignment to the AEF program and acknowledging his six year obligation:

> I fully understand that, by virtue of having been enlisted in the U.S. Navy as a SNJC I am guaranteed assignment to

---

**3.** For an analysis of the effectiveness of VRB awards in eliminating career manning shortages in critically needed skills, see Comptroller General, Military Retention Incentives: Effectiveness and Administration (B–160096) (1974).

**4.** Section 1346(a)(2) of Title 28 provides in relevant part:

> The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
>
> . . . Any other civil action or claim against the United States, not exceeding $10,-000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

**5.** The District Court opinion is reported at 365 F.Supp. 140 (D.D.C.1973).

**6.** Affidavit of Nicholas J. Larionoff, App. at 17.

either one of a group of service schools or to [*sic*] duty in a specific apprenticeship field upon successful completion of recruit training. I desire to waive my rights guaranteed by my enlistment contract, and I hereby request that my rate be changed in equal pay grade to SNJEF. This change of rate is requested for the purpose of: Assignment to the advanced electronics field program. The provisions of this program, the category to which my rate will be changed and the six (06) years service obligation have been fully explained to me.

App. at 135.

On March 9, 1970 Larionoff successfully completed the AEF training program and was advanced to the CTM rating and the E–4 pay grade. He executed a document on that date attesting to his advancement to the E–4 pay grade.[7]

Up to this point in time, neither the Navy nor plaintiff Larionoff had reason to complain about the events that had transpired. The complicating factor, however, was that Larionoff still *expected to receive* a Variable Reenlistment Bonus once he entered into his period of extended service on June 23, 1973. The Navy cast some doubt on that expectation when it announced on March 24, 1972 that effective July 1, 1972 the CTM rating would no longer be desig-

nated as a "critical military skill" eligible for the VRB award. After realizing that the Navy considered him ineligible for a Variable Reenlistment Bonus, Larionoff had his elected representatives in Congress communicate with the Bureau of Naval Personnel concerning his eligibility for the VRB.[8] These efforts were unsuccessful; the Bureau asserted that the CTM service rating had been removed from the list of eligible service ratings, thus precluding payment of a VRB to plaintiff Larionoff.[9]

The other six named plaintiffs[10] have undergone similar administrative processing by the Navy. They all signed extension agreements[11] subsequent to April 20, 1966 (the date the CTM rating was designated as a "critical military skill") extending their enlistments for two years for the purpose of receiving AEF training; executed documents requesting assignment to AEF training and acknowledging their six year obligations; received their training, were advanced to the CTM rating and the E–4 pay grade prior to July 1, 1972; executed documents attesting to their advancement to the E–4 pay grade; entered the extension periods of their enlistments subsequent to July 1, 1972 (the date that the "critical military skill" designation for the CTM rating was terminated); and received their Regular Reenlistment Bonuses.[12]

---

**7.** I understand and agree that upon my being advanced to pay grade E–4 in accordance with BUPERSINST 1430.14 series, that page 1A ["Agreement to Extend Enlistment"] date 09 JUL 69, which was executed for the purpose of AEF Program, will become binding and will serve to fulfill the obligated service requirements for automatic advancement. I understand that any future cancellation of obligated service requirements for the purpose of AEF Program will not serve as reason for cancellation of page 1A dated 09 JUL 69 except as set forth in BUPERSMAN 1050300.

App. at 130.

**8.** Larionoff apparently also asked his elected representatives to pursue the question of rescission of the extension agreement. *See* App. at 152, 163.

**9.** The Bureau also stated that the extension agreement was "legal and binding and may not

be abrogated based on [Larionoff's] ineligibility for VRB." App. at 161; *see* note 8 *supra*.

**10.** Thomas W. Dietz, Joseph R. Tomaino, Lawrence E. White, Paul E. Boudreau, Johnnie S. Johnson, John Clay Smith.

**11.** The affidavits in the record of Dietz, Tomaino, White, and Boudreau indicate that the VRB program was explained to them prior to the execution of their extension agreements, but that no one explained to them that the applicable VRB award level could subsequently be changed. *See* App. at 13, 15, 19, 20.

**12.** At the time briefs were filed in this case, plaintiff Johnson had not yet entered the extension period of his enlistment and consequently was not eligible at that time *to receive* his Regular Reenlistment Bonus.

As to the other six named plaintiffs, it was stipulated by the parties that they could receive their Regular Reenlistment Bonuses without

On March 30, 1973, the named plaintiffs filed this class action [13] in the District Court seeking either payment of the VRB award level in effect when the extension agreements were signed or rescission of their extension agreements.[14] On September 28, 1973, the District Court certified the action as a class action pursuant to Rule 23(b)(1)(B); granted plaintiffs' motion for summary judgment and ordered payment of VRBs; and awarded plaintiffs' counsel attorneys' fees of $14,729.00 to be obtained from the class recovery. The Government appeals, claiming error with respect to both the grant of the motion for summary judgment and the class certification. The plaintiffs cross-appeal with respect to the failure of the District Court (1) to order rescission, (2) to order disclosure by the government of the names of members of the class, and (3) to compensate adequately plaintiffs' attorneys.

## II. ENTITLEMENT TO THE VARIABLE REENLISTMENT BONUS

Plaintiffs offer two theories to support their contention that they are entitled to receive VRBs. They first argue that they executed their extension agreements "in consideration of the pay, allowances, and benefits" which were to accrue during the period of extended service, see 175 U.S. App.D.C. pages ———, 533 F.2d page 1170 supra, and that the term "pay" includes awards of VRB. As an alternative ground, plaintiffs maintain that they are entitled to receive VRBs on a theory of promissory estoppel in that they relied to their detriment on oral representations concerning VRB eligibility made by naval personnel attempting to get them to execute extension agreements. We find it unnecessary to reach the issue of promissory estoppel since we find that under applicable military regulations plaintiffs are entitled to VRBs as part of the "consideration" for which they executed extension agreements.[15] Since our interpretation of the relevant regulations depends in part on the legislative history of the statutory provisions delegating to the Secretary of Defense the authority to prescribe eligibility criteria, we turn first to an analysis of the basic statutory provisions establishing the VRB award.

### A. Statutory Provisions

As early as 1795, Congress provided by statute for the payment of a "reenlistment

prejudice to their claims for VRBs. App. at 248.

13. The initial complaint described the class as follows: "All persons in the U.S. Navy who reenlisted for two years additional duty prior to July 1, 1972, in a critical skill training program pursuant to § 308(g) Title 37 U.S. Code, that had a bonus multiple of four prior to the above date and which was subsequently eliminated upon that date." App. at 8. The amended complaint, filed on August 20, 1973, contained a similar, but not identical, description of the class: "All persons in the U.S. Navy who enlisted for an additional period prior to July 1, 1972 in a critical skill training program pursuant to § 308(g), Title 37 U.S. Code, that as a communications technician had a variable bonus multiple of four prior to the above date and which was subsequently eliminated upon that date." App. at 208–09.

14. Actually, the initial complaint filed on March 30, 1973 sought only a declaratory judgment, an order setting "the case down for prompt hearing to fashion the relief required for each plaintiff," and such other relief "as is necessary and proper." App. at 11. The District Court granted plaintiffs' counsel leave to amend the complaint to avoid dismissal for lack of subject matter jurisdiction, 365 F.Supp. at 146, and it was in the amended complaint that plaintiffs specifically requested either award of VRBs or rescission. App. at 211. In the event the District Court awarded rescission, plaintiffs asked that defendants be ordered to grant each of the plaintiffs an Honorable Discharge pursuant to 10 U.S.C. § 6291. App. at 211.

15. The Supreme Court has emphasized that "[a] soldier's entitlement to pay is dependent upon statutory right." Bell v. United States, 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961). All parties to this case recognize that since the applicable statute provides that payment of VRB awards is to be determined according to "regulations prescribed by the Secretary of Defense," the outcome under the plaintiffs' contract theory depends primarily on our interpretation of the applicable regulations.

bonus" to members of the armed services who reenlisted within a short period following their separation from the service, and eligibility for that bonus was eventually extended to those who agreed to extend the length of their service obligation prior to the expiration of the period for which they had agreed to serve.[16] The method of computing the amount of the bonus has varied, but by 1954 Congress settled on the following formula: the monthly basic pay of the serviceman at the time of discharge or release *times* the number of years specified in the reenlistment contract. *See* Act of July 16, 1954, Pub.L.No.506, § 2, 68 Stat. 488.[17]

The Department of Defense eventually recognized that the statutory formula was inefficient since it failed to vary the monetary incentive for reenlistment according to the needs of the armed services for personnel with particular skills. In other words, if a branch of the armed services was adequately manned except for a critical shortage of communications technicians, that

16. Early statutes providing a monetary bonus upon reenlistment include: Act of Jan. 2, 1795, ch. 9, § 5, 1 Stat. 408 (reenlistment bounty for certain members of the army); Act of Mar. 3, 1795, ch. 44, § 6, 1 Stat. 430 (same); Act of May 30, 1796, ch. 39, § 7, 1 Stat. 484 (same); Act of Jan. 27, 1814, ch. 7, § 4, 3 Stat. 95 (same); Act of July 5, 1838, ch. 162, § 29, 5 Stat. 260, *as amended,* Act of Aug. 3, 1861, ch. 42, § 9, 12 Stat. 288 (same); Act of Aug. 4, 1854, ch. 247, § 2, 10 Stat. 575, *as amended,* Act of Mar. 3, 1875, ch. 131, § 10, 18 Stat. 419, *as amended,* Act of Aug. 1, 1894, ch. 179, § 3, 28 Stat. 216, *as amended,* Act of May 11, 1908, ch. 163, 35 Stat. 110, *as amended,* Act of June 4, 1920, ch. 227, § 27, 41 Stat. 775 (same); Act of Mar. 3, 1863, ch. 75, § 18, 12 Stat. 734 (same); Act of Aug. 24, 1912, ch. 391, § 2, 37 Stat. 590 (same); Act of June 3, 1916, ch. 134, § 34, 39 Stat. 188, *as amended,* Act of June 4, 1920, ch. 227, § 31, 41 Stat. 775 (same); Act of Mar. 3, 1845, ch. 77, § 9, 5 Stat. 795 (additional pay for certain reenlistments in the Marine Corps.); Act of Aug. 5, 1854, ch. 268, 10 Stat. 586 (same); Act of Mar. 2, 1837, ch. 21, § 3, 5 Stat. 153 (additional pay for certain reenlistments in the naval service); Act of Mar. 2, 1855, ch. 136, § 2, 10 Stat. 627, *as amended,* Act of June 7, 1864, ch. 111, 13 Stat. 120, *as amended,* Joint Resolution No. 62, 29 Stat. 476 (1896), *as amended,* Act of Mar. 3, 1899, ch. 413, § 16, 30 Stat. 1008, *as amended,* Act of Aug. 22, 1912, ch. 335, 37 Stat. 331, *as amended,* Act of July 12, 1921, ch. 44, § 2, 42 Stat. 139 (same).

In 1922, Congress enacted a single and more systematic piece of legislation authorizing reenlistment bonuses to enlisted members of the army, navy, and marine corps. Act of June 10, 1922, ch. 212, §§ 9–10, 42 Stat. 629–30, *as amended,* Act of June 16, 1942, ch. 413, §§ 10, 19, 56 Stat. 364, 369, *as amended,* Act of Sept. 7, 1944, ch. 407, § 8, 58 Stat. 730, *as amended,* Act of June 28, 1947, ch. 162, § 4, 61 Stat. 192. *See also* Act of Aug. 18, 1941, ch. 364, § 2, 55 Stat. 629, *as amended,* Act of June 16, 1942, ch. 413, § 10, 56 Stat. 364, *as amended,* Act of Oct. 12, 1949, ch. 681, § 531(b)(29), 63 Stat. 838. This coordinated approach to reenlistment bonuses was again overhauled in 1949. Career Compensation Act of 1949, ch. 681, § 207, 63 Stat. 811, *as amended,* Act of July 16, 1954, Pub.L.No.506, 68 Stat. 488, *as amended,* Act of July 25, 1961, Pub.L.No.87–103, 75 Stat. 219. These provisions were enacted into positive law in 1962 and *codified as* 37 U.S.C. § 308, *see* Act of Sept. 7, 1962, Pub.L.No.87–649, 76 Stat. 467, and were restated without substantive change in 1968, *see* Act of Oct. 22, 1968, Pub.L. No.90–623, §§ 3(1), 6, 82 Stat. 1314–15.

In 1974, Congress amended the relevant statutory provisions to limit eligibility for the reenlistment bonus to those servicemen who possess skills designated as "critical" by the Secretary of Defense. Armed Forces Enlisted Personnel Bonus Revision Act of 1974, § 2(1), 37 U.S.C. § 308 (Supp.IV, 1974). The 1974 amendments also contained a grandfather clause preserving the options of those servicemen eligible for a reenlistment bonus on the date before the effective date of the 1974 amendments. Armed Forces Enlisted Personnel Bonus Revision Act of 1974, Pub.L.No.93–277, § 3, 88 Stat. 121.

17. The formula in text applies only to a serviceman's *first* reenlistment; bonus awards for subsequent reenlistments were calculated according to slightly different formulae producing progressively smaller bonus awards. The *Variable* Reenlistment Bonus awards at issue in this case are a function of the *Regular* Reenlistment Bonus awards for first time reenlistments only. Act of August 21, 1965, Pub.L.No.89–132, § 3, 79 Stat. 547, *as amended,* Act of Oct. 22, 1968, Pub.L.No.90–623, §§ 3(1), 5, 82 Stat. 1314–15, *as amended,* 37 U.S.C. § 308 (Supp.IV, 1974).

It is also important to note that Congress has often established a limitation on the total amount that could be paid to an enlisted member in the form of regular reenlistment bonuses. *See, e. g., Career Compensation* Act of 1949, ch. 681, § 207(a), 63 Stat. 811. The Variable Reenlistment Bonus does not count toward this statutory maximum. Act of August 21, 1965, Pub.L.No.89–132, § 3, 79 Stat. 547, *as amended,* 37 U.S.C. § 308 (Supp.IV, 1974).

branch would nevertheless be prohibited by statute from offering communications technicians a stronger incentive in the form of a larger reenlistment bonus. Consequently, the President's 1965 legislative proposals to Congress concerning increased pay for servicemen included a recommendation that the Department of Defense be authorized to award an additional flexible reenlistment bonus to enable the Department to provide a strong reenlistment incentive to those personnel whose skills were in short supply.[18]

The Defense Department urged both the House and Senate Armed Services Committees to act favorably on this Variable Reenlistment Bonus incentive provision:

> Additional reenlistments are needed in specialties accounting for about 40 percent of total enlisted force strength in order to achieve all of the services' manning objectives. The problem is much more serious in a smaller portion of our force. *In a few of the most critically undermanned specialties, comprising about 5 percent of our force strength, losses of $10,000 or more occur whenever a first termer fails to reenlist and operational capability suffers because of severe shortages of careerists.* In these skills, additional reenlistment incentives are clearly needed.

> The most attractive way to provide a strong reenlistment incentive to first termers in a small part of the force is through a variable reenlistment bonus. *A reenlistment bonus concentrates retention money at the reenlistment decision point, thereby getting the most drawing*

*power per retention dollar.* A variable bonus can be tailored to fit particular skill retention requirements and can be changed as those requirements change since there are no express or implied commitments about future payments. The present reenlistment bonus does not discriminate among skills and thereby does not help solve the selective retention problem.

H.R.Rep.No.549, 89th Cong., 1st Sess. 47–48 (1965) (emphasis added). *See* S.Rep.No.544, 89th Cong., 1st Sess. 18 (1965), U.S.Code Cong. & Admin.News 1965, p. 2745; Hearings on H.R. 5725 and H.R. 8714 Before the House Comm. on Armed Services, 89th Cong., 1st Sess., ser. 13, at 2545, (1965) (Statement of then Secretary McNamara). Both committees approved the following Variable Reenlistment Bonus award provision:[19]

> Under regulations to be prescribed by the Secretary of Defense, or the Secretary of the Treasury with respect to the Coast Guard when it is not operating as a service in the Navy, a member who is designated as having a critical military skill and who is entitled to a [Regular Reenlistment] bonus . . . upon his first reenlistment may be paid an additional amount not more than four times the amount of that bonus.

In the course of the floor debate over what was to become the Uniformed Services Pay Act of 1965, it became quite clear the Department of Defense had convinced the Congress that the VRB provision was cost-justified since it would save the Government the cost of training a replace-

---

**18.** The President proposed adding the following provision to section 308 of Title 37 of the United States Code:

(g) Under regulations to be prescribed by the Secretary of Defense, or the Secretary of the Treasury with respect to the Coast Guard, a member who is designated as having a critical military skill and who is entitled to a bonus computed under subsection (a) upon his first reenlistment may be paid an additional amount not more than four times the amount of that bonus. An amount paid under this subsection does not count against the limitation prescribed by section (c) of this

section on the total amount that may be paid under this section.

H.R.Doc.No.170, 89th Cong., 1st Sess. 12 (1965).

**19.** The House committee modified the language of the proposed VRB provision to provide for payment of the VRB in yearly installments, thus easing the tax impact on the recipient. H.R.Rep.No.549, 89th Cong., 1st Sess. 48 (1965). Except for that modification, the language approved by the committees is essentially the same as that proposed by the President. *See* note 18 *supra*.

ment whenever a first term enlisted member decided to reenlist.[20] *See, e. g.,* 111 Cong.Rec. 17206 (1965) ("[T]he career motivation that will be generated among the hard core elements, specifically the highly technically trained people throughout the services, will more than make up in actual dollars saved for the cost of the legislation.") (remarks of Representative Morton); *id.* at 17206 ("It is just plain good personnel planning to provide a $4,000 bonus to encourage reenlistment rather than pay $10,000 to train a replacement.") (remarks of Representative Bennett); *id.* at 17209 (remarks of Representative Dole); *id.* at 20034 (remarks of Senator Russell). And it is also clear that Congress viewed the VRB provision as an effective incentive to be brought to the attention of enlisted personnel at the point in time when they are choosing whether and how long to continue military service.[21] *See, e. g., id.* at 17201 ("The [variable reenlistment] bonus would channel additional pay into these specialties. It offers the incentive toward career service at just the time that it will be most effective, when an individual decides whether or not to reenlist.") (remarks of Representative Nedzi).

With these objectives in mind, Congress enacted the VRB provision as recommended by the House and Senate committees, delegating to the Secretary of Defense the authority to issue regulations for the administration of the VRB program. Act of August 21, 1965, Pub.L.No.89–132, § 3, 79 Stat. 547, *as amended,* Act of Oct. 22, 1968, Pub. L.No.90–623, §§ 3(1), 5, 82 Stat. 1314–15, *as amended,* 37 U.S.C. § 308 (Supp. IV, 1974).

**B. Military Regulations**[22]

In interpreting the regulations issued by both the Department of Defense and the Department of the Navy with respect to the VRB program, it is important to emphasize the narrow question at issue. The Government takes the position that under applicable military regulations eligibility for a Variable Reenlistment Bonus attaches *at the date of actual entry* into the reenlistment or extension period. Brief at 21. The Government does not argue that appellants would not have been entitled to a VRB if the CTM service rating had been designated as a critical military specialty when they entered their periods of extended service.[23] Nor does the Government argue that appellants are not entitled to the Regular Reenlistment Bonus that at least until 1974 was automatically paid upon extension or reenlistment.[24] The Government simply maintains that appellants are entitled only to the VRB in effect when they actually entered into the period of extended service, which for each appellant amounts to zero.

At first glance, the applicable military regulations would seem to support the Government's position. The Department of Defense Directive prescribing policies for award of the VRB deals specifically with the question of reduction and termination of VRB awards:

> When a military skill is designated for reduction or termination of award an effective date for reduction or termination of awards shall be established and announced to the field at least 90 days in advance. All awards on or after that effective date in military skills designated for reduction of award level will be at

**20.** *See Deschler v. United States,* 203 Ct.Cl. 477, 483–84 (1974); 47 Comp.Gen. 414, 416 (1968).

**21.** *See Parker v. United States,* 198 Ct.Cl. 661, 666, 461 F.2d 806, 809 (1972).

**22.** The regulations discussed in this section of the opinion are recent regulations reprinted in the Appendix filed with the court. We are told in the Government's brief that similar requirements were contained in earlier versions of the regulations. Brief at 21 n.13; *see* App. at 89.

**23.** In its brief, the Government concedes that the term "pay" in the extension agreement includes the VRB. Brief at 16. Thus, if the Navy had *reduced* rather than *terminated* the VRB award level for the CTM rating, the Government would apparently contend that appellants were entitled only to the lower VRB award level.

**24.** *See* note 12 *supra.*

the level effective that date and no new awards will be made on or after the effective date in military skills designated for termination of awards.

DOD Directive 1304.14, ¶ IV.F. (Sept. 3, 1970). Of course, that Directive is at best ambiguous, in that it is not clear whether a VRB is "awarded" when an enlisted member signs an agreement to extend enlistment or when he or she actually begins to serve the period of extension. Section IV.-D.2. of the Directive, however, tells us that "[s]pecific provisions for individual eligibility of enlisted members for receipt of awards" are contained in a separate Department of Defense Instruction.

That separate regulation also addresses the question of reduction and termination of awards:

> Members serving in a military specialty designated for reduction or termination of award under the provisions of subsection IV.F. of reference (a), will receive the award level effective on the date of their reenlistment or extension of enlistment, *except as provided in paragraph V.B.1.f. above.*

Department of Defense Instruction 1304.15, ¶ VI.A. (Sept. 3, 1970) (emphasis added). Were it not for the "except" clause, this regulation would also apparently support the Government's interpretation of the VRB program.[25] The question thus becomes whether "paragraph V.B.1.f." leads to a different result.

The relevant portion of paragraph V.B.1. provides that "[a]n enlisted member is eligible to receive a Variable Reenlistment Bonus if he . . .

> f. Attains eligibility prior to the effective date of termination of awards in any military specialty designated for termination of the award. Member must attain eligibility prior to the effective date of a reduction of award level to be eligible for the higher award level. *Eligibility attained through any modification of an exist-*

*ing service obligation, including any early discharge granted pursuant to 10 U.S.C. 1171, must have been attained prior to the date the authority approving the modification was notified of the prospective termination or reduction of award in the military specialty.*

(Emphasis added.) And the regulations issued by the Department of the Navy indicate that an extension of enlistment qualifies as a form of "modification of an existing service obligation":

> Member must attain eligibility prior to the effective date of a reduction of award level to be eligible for the higher award level. Eligibility attained through an early discharge for the purpose of immediate reenlistment, *or extension of enlistment, or other modification of an existing service obligation* including any early discharge granted pursuant to article 3840240 of reference (d) (discharge within 3 months of expiration of active obligated service) shall be attained prior to the date the authority approving the modification is notified or the prospective termination or reduction of award in the [service rating]. This is the date a command receives the Bureau of Naval Personnel directive announcing termination or reduction of awards in the [service rating].

BUPER INST 1133.18E, ¶ 7.h. (Mar. 23, 1972) (emphasis added).

Paragraph V.B.1.f. of the Defense Instruction and paragraph 7.h. of the Navy Instruction were apparently designed to prevent enlisted members from receiving the higher award level of a VRB scheduled for reduction merely by modifying their service obligations *after* learning of the planned reduction but *prior* to its effective date. Thus, if the Navy announced on March 24, 1972 that a VRB with a multiple of four was to be reduced to a multiple of two for the CTM rating effective July 1, 1972, an enlisted member extending his or her service obligation after March 24,

---

**25.** Actually, it would be possible to read "extension of enlistment" to mean, at least for the purposes of the quoted paragraph, the date on which the extension agreement is signed. Our interpretation of paragraph V.B.1.f., however, makes it unnecessary to clarify that ambiguity.

1972 [26] and entering on the period of extension prior to July 1, 1972 would nevertheless be entitled only to the lower VRB award level with a multiple of two. Only those enlisted personnel modifying their service obligations prior to March 24, 1972 would have attained eligibility for the higher VRB award level with a multiple of four.

■ The application of these regulations to appellants leads us to conclude that they are entitled to the VRB award level in effect on the date they signed their respective agreements to extend enlistment.[27] Those agreements were executed prior to March 24, 1972, the date on which the Navy announced termination effective July 1, 1972 of the VRB award for the CTM rating. If appellants are otherwise entitled to receive a VRB award, as the Government concedes they are, that award is not to be determined according to the award level in effect on the date they actually entered into their respective periods of extension, but rather according to the award level in effect when they executed their extension agreements.

To hold otherwise would undermine the explicit language of paragraphs V.B.1.f. and 7.h. of the appropriate regulations, in that neither those who extended their enlistments *on or after* March 24, 1972 nor those who extended their enlistments *before* March 24, 1972 could attain eligibility for the higher award if they were to begin their extended service on a date after July 1, 1972. The paragraphs referred to above obviously contemplate a situation in which enlisted personnel *attain eligibility* prior to the point at which they enter into periods of extended service.

Moreover, the Government's interpretation would lead to results clearly at odds with the explicit congressional objectives. For example, under the Government's approach an enlisted member who signed an extension agreement when the VRB award level was at a multiple of two but entered into extended service when the multiple was set at four would receive the *higher* award level. Despite the fact that a bonus with a multiple of two was a sufficient reenlistment incentive for that enlisted member, the Government would apparently award him a windfall in the form of a bonus with a multiple of four.

The Government's interpretation would also frustrate congressional objectives by complicating the decision whether to reenlist. The legislative history indicates that Congress intended to offer enlisted personnel a specific sum [28] in addition to the automatic Regular Reenlistment Bonus as an incentive to reenlist in skill areas in critically short supply. Under the Government's approach, an enlisted member (with a skill designated as critical) considering extension of service would have to weigh not the current VRB award level, but the VRB award level in effect on the date on which he or she would actually begin serving the period of extension. The latter VRB award level would be a function of the Navy's manpower needs at that time as well as the extent to which the prospect of an uncertain VRB award level had already helped to satisfy those requirements. Information concerning those factors would rarely be readily accessible to enlisted personnel making a reenlistment or extension decision, and we find no evidence in the legislative background of the 1965 amendments to

---

**26.** Actually, the appropriate date is the date the command receives the Navy directive announcing termination or reduction of awards in relevant service ratings. BUPER INST 1133.18E, ¶ 7.h. (Mar. 23, 1972).

**27.** The applicable military regulations prescribe a number of conditions that must be satisfied before an enlisted member can receive his Variable Reenlistment Bonus. Our decision does not eliminate the other conditions established by the military departments. We merely hold that an enlisted member who extended his or

her service obligation and who is *otherwise qualified* for a VRB award—as the Government concedes these plaintiffs are—is entitled to the VRB award level in effect on the date the extension contract is signed.

**28.** The sum is "specific" in the sense that it is set by military authorities at some multiple of the Regular Reenlistment Bonus. As noted above, the multiple will vary among service ratings according to the need for enlisted personnel with particular skills.

warrant the conclusion that Congress intended enlisted personnel to make reenlistment decisions in the face of such uncertainty.[29]

The Government authored these extensions contracts, and it could easily have inserted a provision limiting an enlisted member's VRB eligibility to the award level in effect on the date of actual entry into the period of extended service. Undoubtedly, if such a provision had been included, the Navy would have witnessed fewer extensions of enlistment.[30] But there is no express limitation on eligibility, and the Government is therefore bound by the actual contract terms and the applicable military regulations. Although we recognize that these rather complex military regulations are not free from ambiguity, the factors outlined above lead us to conclude that under a reasonable interpretation of the contracts the appellants are entitled to the VRB award level in effect at the time they signed their extension contracts. Our conclusion in that regard is reinforced by our obligation to construe most strongly against the Government, as against any other drafter of a contract, ambiguous contract terms that are subject to a reasonable and practical interpretation other than that offered by the drafter. *United States v. Seckinger,* 397 U.S. 203, 210, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); 3 A. Corbin, Contracts § 559 (1960). Since the regulations at issue recognize that eligibility can be attained prior to actual entry into the period of extended service, and since the Government's interpretation of the regulations, unlike that of the plaintiffs, is at odds with congressional intent,[31] we construe the contracts to mean that appellants are entitled to the VRB award level in effect when they signed their extension agreements.[32]

---

**29.** Indeed, Navy regulations governing reenlistment interviews for potential reenlistees eligible for the VRB require coverage of the "[a]dvantages of early reenlistment to obtain present amount of VRB vice uncertainty of future value of the VRB." BUPER INST 1133.-18E, ¶ 9.a.(6) (Mar. 23, 1972). *See also* note 30 *infra.*

**30.** *See, e. g.,* Affidavit of Thomas W. Dietz, App. at 19 ("I would have definitely not signed the Extension of the Enlistment contract if the personnel involved in my counseling procedure had presented the possibility that the VRB could be withdrawn on a moments [*sic*] notice."). Such a contract provision would inform enlisted personnel that they would be making reenlistment decisions in the face of conditions of uncertainty. We note that as a result the effectiveness of the VRB program would depend not only on the expected value of the VRB award at the time of actual entry into the period of extended service, but also on the attitudes of enlisted personnel toward risk. Friedman & Savage, *The Utility Analysis of Choices Involving Risk,* 56 J.Pol.Econ. 279 (1948); *see* R. Posner, Economic Analysis of Law 72–73 (1972) (discussing the relevance of attitudes toward risk in the accident field). In effect, the Government's interpretation of the regulations (or a contract provision making that interpretation explicit) provides enlisted personnel with an opportunity to purchase a "lottery ticket" by signing agreements to extend enlistment; the "lottery ticket" offers some probability of a VRB award equal to the award level in effect at the time the agreement is signed, some probability of a VRB award

level less than that in effect at the time of the signing, and some probability of no VRB award at all. And enlisted personnel who are risk averse—that is, they are willing to pay a premium to avoid risk—might well decide against such a gamble, whereas the same personnel would be willing to extend their enlistment in exchange for a contractual promise by the government to offer a sum certain on the date of entry into extended service.

**31.** The Government's current interpretation also stands in stark contrast to the Defense Department's recommendation to Congress that "[a] reenlistment bonus concentrates retention money at the reenlistment decision point." *See* 175 U.S.App.D.C. p. ——, 533 F.2d p. 1174 *supra.* The two statements can be reconciled only if the date of actual entry into the extension period is a "decision point,"—that is, a point at which plaintiffs could decide not to continue military service. But the Navy has emphasized, and the Government presently contends, that the extension agreements are binding and that the date of actual entry is not a "decision point" for these plaintiffs.

**32.** When considered in the context of the entire VRB regulatory scheme, the Government's interpretation of VRB eligibility requirements has the potential of producing serious inequities. Under the relevant Department of Defense Directive, the Secretaries of the Military Departments and the Assistant Secretary of Defense are directed to conduct "an annual review of the retention and career manning situation in any military specialty that has attained or is

## C. The 1974 Repeal of the Variable Reenlistment Bonus Program

Effective June 1, 1974, Congress repealed the statutory provisions providing for the Regular Reenlistment Bonus and the Variable Reenlistment Bonus and substituted a provision authorizing a new "Selective Reenlistment Bonus" (SRB). Armed Forces Enlisted Personnel Bonus Revision Act of 1974, Pub.L.No.93–277, § 2(1), 37 U.S.C. § 308 (Supp. IV, 1974).[33] The 1974 amendments specifically provide that an enlisted member on active duty on the effective date of the amendments "who would have been eligible, at the end of his current or subsequent enlistment, for the [Regular Reenlistment Bonus] as it existed on the day before the effective date of [the amendments] shall continue to be eligible for the [RRB] as it existed on the day before the effective date of [the amendments]." But a similar savings clause was not enacted for enlisted personnel eligible for a Variable Reenlistment Bonus before the effective date of the 1974 amendments. Consequent-

ly, although it has not been raised by any of the parties, we are confronted with the question whether named plaintiff Johnson, who was scheduled to enter his period of extended service *after* the effective date of the 1974 amendments, is no longer entitled to receive a VRB.[34]

■ Since contractual rights against the government are property interests protected by the Fifth Amendment, Congressional power to abrogate existing government contracts is narrowly circumscribed. *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *see Federal Housing Administration v. Darlington, Inc.,* 358 U.S. 84, 97–98, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958) (Harlan, J., dissenting). And although Congress may constitutionally impair existing contract rights in the exercise of a paramount governmental power such as the "War Powers," U.S.Const. art. I, § 8, cl. 11, 12, 14, Congress is "without power *to re-*

projected to attain a *career manning level* of more than 105 percent." DOD Directive 1304.-14, ¶ IV.F.1. (Sept. 3, 1970) (emphasis added). If, taking into account projected retention and career manning in the absence of the VRB award level, the award is no longer needed to avoid a significant shortage in career manning, the VRB for that specialty must be designated for reduction or termination. *Id.* at ¶ IV.F.1.a, b.

The *career manning level* is the ratio of the number of *career personnel* in a military specialty to the career requirements in that specialty. *Id.* at ¶ III.K. And *career personnel* is defined to include "first term personnel who are serving in an enlistment, as extended, *or* an extension of enlistment that will total six or more years of active service." *Id.* at ¶ III.I. (emphasis added). Consequently, appellants, by extending their enlistments at a time when the VRB award level was set at a multiple of four, may have contributed to the very satisfaction of Navy personnel requirements that led to termination of the VRB for the CTM rating. Indeed, in explaining to plaintiff Larionoff's elected representatives why he was ineligible for the VRB award, the Chief of Naval Personnel wrote: "Although the communications technician (maintenance) rating was formerly VRB eligible, *the most recent review of the manning levels* dictated that it be removed from the eligibility list." App. at 149 (emphasis added).

**33.** The new statute provides in relevant part:

(a) A member of a uniformed service who—

(1) has completed at least twenty-one months of continuous active duty (other than for training) but not more than ten years of active duty;

(2) is designated as having a critical military skill by the Secretary of Defense, or by the Secretary of Transportation with respect to the Coast Guard when it is not operating as a service in the Navy;

(3) is not receiving special pay under section 312a of this title; and

(4) reenlists or voluntarily extends his enlistment in a regular component of the service concerned for a period of at least three years;

may be paid a bonus, not to exceed six months of the basic pay to which he was entitled at the time of his discharge or release, multiplied by the number of years, or the monthly fractions thereof, of additional obligated service, not to exceed six years, or $15,000 whichever is the lesser amount. Obligated service in excess of twelve years will not be used for bonus computation.

**34.** We are informed by the Government's brief that plaintiff Johnnie S. Johnson was scheduled to begin his period of extended service on August 28, 1974. Brief at 7 n. 9.

*duce expenditures* by abrogating contractual obligations of the United States." *Lynch v. United States, supra,* 292 U.S. at 580, 54 S.Ct. at 844 (emphasis added); *see id.* at 579. *Compare Schultz v. Clifford,* 303 F.Supp. 965 (D.Minn.1968), *aff'd,* 417 F.2d 775 (8th Cir. 1969), *cert. denied,* 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); *Pfile v. Corcoran,* 287 F.Supp. 554 (D.Colo. 1968).

Although the stated purpose of the 1974 amendments was to "provide authority to grant enlistment and reenlistment bonuses to enlisted personnel on a selective basis to fill critical and shortage skill requirements in the armed services, in an all-volunteer environment," H.R.Rep.No.93–857, 93d Cong., 2d Sess. 3 (1974), U.S.Code Cong. & Admin.News 1974, pp. 2984, 2985, our review of the legislative history leads us to conclude that the ·Congress was primarily concerned with reducing government expenditures by more narrowly tailoring the reenlistment bonus scheme to actual military requirements. *See* S.Rep.No.93–659, 93d Cong., 2d Sess. (1973); H.R.Rep.No.93–857, 93d Cong., 2d Sess. (1974); H.R.Conf. Rep.No.93–985, 93d Cong., 2d Sess. (1974); U.S.Code Cong. & Admin.News 1974, pp.

2984, 2985. The Department of Defense specifically recommended the 1974 amendments to Congress as "an opportunity to save money while simultaneously improving our management of reenlistment incentives." S.Rep.No.93–659, 93d Cong., 2d Sess. 8 (1973); H.R.Rep.No.93–857, 93d Cong., 2d Sess. 9 (1974).

 Since there is absolutely no basis in the legislative history to justify a conclusion that Congress was exercising some paramount power enabling it to abrogate existing contract rights, plaintiff Johnson's contractual entitlement to a VRB stands unimpaired after the 1974 amendments.[35]

*D. The Issue of Rescission of the Extension Agreements*

The amended complaint, asserting jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2), asked that the Government "be ordered to pay to each of the plaintiffs the bonus provided by his contract *and/or the contracts of the plaintiffs be deemed rescinded and declared of no further force and effect.*" App. at 211 (emphasis added). Plaintiffs now maintain that the District Court erred when it refused to declare the contracts rescinded.

---

**35.** This identical question was recently presented by different groups of naval enlisted personnel to the District Court for the Eastern District of Virginia in *Carini v. United States,* Civil No. 74–88–NN (Jan. 7, 1975), to the District Court for the District of Hawaii in *Collins v. Schlesinger,* Civil No. 75–0053 (May 20, 1975), to the District Court for the Southern District of California in *Aikin v. United States,* Civil No. 75–0062–N (Aug. 26, 1975), and to the District Court for the District of Connecticut in *Caola v. United States,* 404 F.Supp. 1101 (1975). Those courts reached the same conclusion as we reach today.

We are aware that the Fourth Circuit has reversed the District Court decision in *Carini* on the ground that the 1965 statute was not "a part of the reenlistment agreement," 528 F.2d at 741, and that the "contract . . . anticipated possible statutory change," 528 F.2d at 741. *Carini v. United States,* No. 75–1399 (Dec. 19, 1975). We obviously disagree. The Government argued that the case before us turns primarily on the construction of the applicable military regulations. Brief at 15. And as our textual discussion indicates, we construe those regulations to mean that VRB eligibility

attaches when an extension agreement is signed. Thus, under our view of the case, the contract clause did not anticipate possible statutory changes and an explicit clause would have been necessary to achieve that effect given existing regulations. *See* pages 175 U.S. App.D.C., ──── ────, 533 F.2d pages 1178–1179 *supra.*

The Fourth Circuit opinion in *Carini* also places some emphasis on the Congressional intent evidenced in a section of the Conference Report accompanying the 1974 statute ironically labeled "Clarification of interpretation of bill language". H.R.Rep.93–985, 93d Cong., 2d Sess. 4 (1974), U.S.Code Cong. & Admin.News 1974, p. 3000. Even if we were to agree that the language in the report indicates that Congress intended to allow the members of this class to become eligible for the new Selective Reenlistment Bonus "if, during the initial enlistment period, the old reenlistment extension agreements are cancelled and new ones executed calling for a longer period of extended service," 528 F.2d at 740, we would still be unable to find any reason to justify congressional abrogation of existing contract obligations to members of the class.

Rescission is an equitable remedy, and we must keep in mind that courts exercising Tucker Act jurisdiction generally do not have jurisdiction over suits for equitable relief against the United States. *Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *see Lee v. Thorton,* 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975). The Act authorizes jurisdiction only over actions for money judgments. *United States v. King,* 395 U.S. 1, 2–3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *see United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889). There nevertheless seems to be a narrow "exception" to this limitation on Tucker Act jurisdiction, in that "[w]here the relief is monetary, [courts exercising Tucker Act jurisdiction] can call upon such equitable concepts as rescission and reformation to help . . . reach the right result." *Quinault Allottee Association v. United States,* 453 F.2d 1272, 1274 n. 1, 197 Ct.Cl. 134, 138 n. 1 (1972); *see United States v. Milliken Imprinting Co.,* 202 U.S. 168, 173–74, 26 S.Ct. 572, 573, 50 L.Ed. 980, 982 (1906).

We have serious doubts as to whether the plaintiff's request for judicial rescission of their extension contracts falls within this narrow exception since it is hard to conceive of how granting that request would be "in aid of [a money] judgment." *Blanc v. United States,* 244 F.2d 708, 709 (2d Cir. 1957). *Compare C. N. Monroe Manufacturing Co. v. United States,* 143 F.Supp. 449 (E.D.Mich.1956); *Kemp v. United States,* 38 F.Supp. 568 (D.Md.1941). *See also Universal Transistor Products Corp. v. United States,* 214 F.Supp. 486 (E.D.N.Y. 1963). We find it unnecessary to resolve these doubts one way or the other, however, since on the basis of the record before us we would find it impossible to sustain a judicial decree of rescission. The payment of VRBs to the plaintiffs is an adequate legal remedy, and we have been offered no evidence indicating that there are exceptional circumstances in this case that justify the grant of equitable relief.

We therefore conclude that the District Court properly limited the relief in this case to the award of VRBs.

## III. CLASS ACTION ISSUES

On September 28, 1973, in the same order granting plaintiffs' motion for summary judgment, the District Court certified this suit as a class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure.[36] The Government argues on

---

**36.** We note that the Government has not challenged on this appeal the merits of the District Court's ruling with respect to the maintenance of this suit as a class action under Rule 23(b)(1)(B). That subdivision covers cases in which "the prosecution of separate actions by or against individual members of the class would create a risk of . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." For a suit to qualify as a class action under this subdivision, it is not necessary for the nonclass judgment to be technically dispositive of the interests of the other members of the putative class, *see* 7A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1774, at 14 (1972), but it must as a practical matter conclude the interests of those members.

It has been held that if the only practical effect which the putative class action would have on the interests of other members of the class is a *stare decisis* effect on actions filed in the same jurisdiction and perhaps a persuasive effect on actions filed in other jurisdictions, the suit would not qualify as a class action pursuant to Rule 23(b)(1)(B). *E. g., Lamar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 467 (9th Cir. 1973); *Richardson v. Hamilton Int'l. Corp.,* 62 F.R.D. 413 (E.D.Pa.1974). As the Ninth Circuit recently observed, allowing the *stare decisis* consequences of an individual action to supply the practical disposition or substantial impairment of the rights of the class "would make the invocation of Rule 23(b)(1)(B) unchallengeable" in cases meeting the class action prerequisites of Rule 23(a). *LaMar v. H & B Novelty & Loan Co., supra,* 489 F.2d at 467.

In deciding not to challenge the merits of the District Court's ruling, the Government apparently concludes that this case meets the practical effect standard of Rule 23(b)(1)(B) precisely because the Government, unlike private litigants, is required to treat all class members alike. *See, e. g., Guadamuz v. Ash,* 368 F.Supp. 1233, 1235 (D.D.C.1973) (action maintained as a class action under Rule 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2)); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania,* 343

this appeal that the District Court erred in certifying this suit as a class action because it did not make its class action determination "as soon as practicable after the commencement" of the action as required by Rule 23(c)(1). The Government also presses the argument that due process required personal prejudgment notice to the easily identifiable members of this Rule 23(b)(1) class, and that the failure of the District Court to order such notice consequently requires reversal of the class action certification. Plaintiffs, who had asked the District Court to order the Government to disclose the names and addresses of members of the class, challenge on appeal the refusal of the District Court to honor that request.[37]

### A. The Requirements of Rule 23(c)(1)

■ Rule 23(c)(1) provides:

As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

The Government argues that the District Court's class action certification must be reversed as inconsistent with Rule 23(c)(1) in that the District Court "did not make a class action determination until the entry of final judgment, some six months after the action commenced." Brief at 25–26.

Clearly, a District Court cannot simultaneously certify an action under Rule 23(b)(3) and enter a final judgment in the action since Rule 23(c)(2)[38] expressly re-

---

F.Supp. 279, 291–92 (E.D.Pa.1972) (defendant class action maintained pursuant to Rule 23(b)(1)(B)).

To the extent that there might be doubt that this suit qualifies for class action status under Rule 23(b)(1)(B), we note that the suit would appear to qualify for class action status under Rule 23(b)(1)(A), which covers cases in which the prosecution of separate actions by or against members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class. *See Maricopa County Mun. Water Con. Dist. v. Looney,* 219 F.2d 529 (9th Cir. 1955) (cited in Advisory Committee Note to Rule 23(b)(1)(A), 39 F.R.D. 100 (1966)); *Guadamuz v. Ash, supra. See generally* 7A C. Wright & A. Miller, *supra,* § 1773 (1974 Supp.); Note, *Community Standards, Class Actions, and Obscenity Under Miller v. California,* 88 Harv.L.Rev. 1838, 1868–69 n. 130 (1975). In their motion in the District Court to confirm the class, the named plaintiffs sought certification under Rule 23(b)(1)(A) as well as under Rules 23(b)(1)(B), 23(b)(2), and 23(b)(3).

In any event, the failure of the Government to challenge on appeal the propriety of the class designation eliminates the need for us to resolve that issue. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095, 4098 n. 7 (U.S. Jan. 21, 1976).

**37.** We find it somewhat difficult to summarize the precise position taken by plaintiffs with respect to the disclosure issue. In their petition to the District Court for reconsideration of its decision, they state: "Although certified as a class under Rule 23(b)(1)(B), . . . the notice provisions of Rule 23(c) do apply as an element of due process in a given set of circum-

stances, *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (CA 2, 1968) and that the circumstances herein demand notice to the class." App. at 269. They then state in their brief on appeal that "[t]his defect may be cured in this Court." Brief at 19. Taken together, these statements could be read to assert that the full *notice requirements* of Rule 23(c)(2) are applicable, including notice concerning the opportunity to "opt out", but that those requirements can be satisfied even after the District Court has entered its judgment. There is, of course, no opportunity to "opt out" of a 23(b)(1) action. On the other hand, the citations in their brief to Fed.R.Civ.P. 23(d) can be read to assert that the District Court had authority under Rule 23(d) to require the Navy Department to *disclose* the names of the members of the class and that the failure of the District Court to exercise that authority was error. We will proceed to treat the argument as one directed at a Rule 23(d) order requiring *disclosure* rather than as one directed at the Rule 23(c)(2) *notice* requirements.

**38.** Rule 23(c)(2) provides:

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specific date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

quires *prejudgment* notice to the absent members of a Rule 23(b)(3) class concerning, among other things, their opportunity to "opt out" of the class.[39] *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). But this suit was certified as a class action pursuant to Rule 23(b)(1)(B), and there is nothing in Rule 23 itself requiring *prejudgment* notice to members of a Rule 23(b)(1)(B) class. Putting to one side the question of a due process requirement of prejudgment notice to absent members of a Rule 23(b)(1) class, we are left with the question of the precise scope of Rule 23(c)(1)'s procedural requirements.

In that regard, we find persuasive a recent analysis of the issue by Justice (then Judge) Stevens:

> The rule unquestionably allows the district judge to exercise his discretion in deciding upon the earliest "practicable" time to determine whether the case is to be processed as a class action; but the text certainly implies, even if it does not state expressly, that such a decision should be made in advance of the ruling on the merits. For the explicit permission to alter or amend a certification order before decision on the merits plainly implies disapproval of such alteration or amendment thereafter. On the other hand, that degree of flexibility permitted before the merits are decided also indicates that in some cases the final certification need not be made *until* the moment the merits are decided.

*Jimenez v. Weinberger,* 523 F.2d 689 at 697 (7th Cir. 1975) (emphasis in original).

Applying that analysis to the facts of this case, we do not think that the District Court committed reversible error in simultaneously certifying the case as a class action and entering summary judgment for the plaintiffs. In the first place, although the Government is correct in stating that the class action was not certified until "some six months after the action commenced," the final certification cannot be considered unreasonably delayed. Plaintiffs filed this suit on March 30, 1973 "on behalf of themselves and on behalf of all others similarly situated," and they filed a motion to confirm the class on April 23, 1973. The Government, after requesting two extensions of time, eventually filed its memorandum in opposition to the motion to confirm the class on June 27, 1973. After the named plaintiffs filed responsive papers in early August, the District Court heard oral argument on plaintiffs' various motions and directed the parties to complete the filing of additional papers by August 24, 1973. Although the District Court could have been more prompt in certifying the action, we do not consider the September 28, 1973 order untimely.[40]

Moreover, absent some showing of actual prejudice either to the Government or to the absent class members, we cannot conclude that the simultaneous entry of the judgment and the class action certification was reversible error. The only prejudicial factor which the Government suggests in this case is that simultaneous entry of the

---

**39.** *Roberts v. American Airlines,* 526 F.2d 757, 762–763 (7th Cir. 1975); *Peritz v. Liberty Loan Corp.,* 523 F.2d 349, 354 (7th Cir. 1975) ("Section 23(c)(1) makes it plain in the second sentence thereof that the order determining class status is to be made and finalized 'before the decision on the merits.' ").

**40.** "[T]he time when a hard determination is 'practicable' as to the propriety of a class action will obviously vary from case to case. . . . [I]t may not be possible to decide even tentatively near the outset of the case whether it should continue as a class action." Frankel, *Some Preliminary Observations Concerning Civil Rule 23,* 43 F.R.D. 39, 41–42

(1967). *See, e. g., Philadelphia Elec. Co. v. Anaconda American Brass Co.,* 42 F.R.D. 324, 325 (E.D.Pa.1967) (the class action question will remain open for at least two or three months given the fact that "[c]ounsel have requested leave to file affidavits, counter affidavits and briefs on this issue, and have indicated that they wish oral argument and possibly additional discovery . . . .."). We think it was appropriate for the District Court to wait at least until the Government provided additional background information relevant to the issue of maintenance of the suit as a class action. *See, e. g., Baxter v. Savannah Sugar Ref. Corp.,* 46 F.R.D. 56, 59–60 (S.D.Ga.1968).

orders precludes the *prejudgment* notice to absent class members that is allegedly required under concepts of due process. It is to that issue that we now turn.

*B. Due Process Notice Requirements*

■ This case thrusts us directly into the controversy over the precise prejudgment notice requirements in Rule 23(b)(1) class actions.[41] The express language of Rule 23 requires prejudgment notice only to absent members of a Rule 23(b)(3) class, but a number of courts have concluded that "notice is required as a matter of due process in all representative actions, and 23(c)(2) merely requires a particularized form of notice in 23(b)(3) actions." *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 564–65 (2d Cir. 1968), *on remand,* 52 F.R.D. 253 (S.D.N.Y. 1971), 54 F.R.D. 565 (S.D.N.Y.1972), *rev'd,* 479 F.2d 1005 (2d Cir. 1973), *vacated,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *Accord, Schrader v. Selective Service System Local Board No. 76,* 470 F.2d 73, 75 (7th Cir.), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 689, 34 L.Ed.2d 672 (1972); *Zeilstra v. Tarr,* 466 F.2d 111, 113 (6th Cir. 1972) (dictum); *e. g., Branham v. General Electric Company,* 63 F.R.D. 667, 669–71 (M.D.Tenn. 1974); *Richmond Black Police Officers Association v. Richmond,* 386 F.Supp. 151, 158 (E.D.Va.1974). We note, however, that there is also considerable authority for the position that prejudgment notice to absent class members is not required in actions certified under sections of the Rule other than 23(b)(3). *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (Rules 23(b)(1) and 23(b)(2)), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir. 1972)

(Rule 23(b)(2)); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir. 1969) (Rule 23(b)(2)) (by implication); *id.* at 1127 n. 1 (Rule 23(b)(2)) (Godbold, J., concurring); *e. g., Lynch v. Household Finance Corp.,* 360 F.Supp. 720, 722 n. 3 (D.Conn.1973) (three-judge court) (Rule 23(b)(2)); *Woodward v. Rogers,* 344 F.Supp. 974, 980 n.10 (D.D.C.1972), *aff'd without opinion,* 159 U.S.App.D.C. 57, 486 F.2d 1317 (D.C.Cir.1973) (Rule 23(b)(2)); *Northern Natural Gas Company v. Grounds,* 292 F.Supp. 619, 636 (D.Kan.1968) (Rules 23(b)(1) and 23(b)(2)); *Johnson v. Baton Rouge,* 50 F.R.D. 295, 299 (E.D.La.1970) (Rule 23(b)(2)). *See also* 3B Moore's Federal Practice ¶ 23.55 (Rules 23(b)(1) and 23(b)(2)); 7A C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1786 (Rules 23(b)(1) and 23(b)(2)). As the extent of the controversy among the various courts no doubt suggests, the due process issue is a difficult one. But our review of recent decisions in this and other federal courts indicates that the controversy has diminished considerably after the Supreme Court's decisions in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) and *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

The question before the Court in *Eisen* was whether Rule 23(c)(2), which requires in Rule 23(b)(3) actions "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort," was satisfied by notice through publication rather than individual notice to the two and one quarter million easily identifiable members of a Rule 23(b)(3) class.[42]

---

**41.** The existing literature and case discussion concerning this due process issue calls to mind a remark that Professor George Stigler made in the opening section of one of his major contributions to the theory of oligopoly: "No one has the right, and few the ability, to lure economists into reading another article on oligopoly theory without some advance indication of its alleged contribution." Stigler, *A Theory of Oligopoly,* 72 J.Pol.Econ. 44 (1964). Fortunately, judges, unlike economists, have a captive audience.

**42.** The actual notification scheme consisted of four elements:

(1) individual notice to all member firms of the Exchange and to commercial banks with large trust departments; (2) individual notice to the approximately 2,000 identifiable class members with 10 or more odd-lot transactions during the relevant period; (3) individual notice to an additional 5,000 class members selected at random; and (4) prominent publication notice in the Wall Street Journal and in other newspapers in New York and California. The [District Court] calculated

Noting that the language of the Rule is "unmistakable", the Court held that individual notice is the "best practicable notice" with respect to those class members whose names and addresses are easily identifiable. At the same time, however, the Court emphasized that it was concerned "only with the notice requirements of subdivision (c)(2)," which is by its terms inapplicable to actions certified under 23(b)(1) or 23(b)(2).[43] 417 U.S. at 177 n.14, 94 S.Ct. at 2152.

Sosna, decided just last Term, provides some firm indication that the Court intends to pursue a different approach to notice problems in actions certified under sections other than 23(b)(3). Sosna involved a class suit for declaratory and injunctive relief challenging the constitutionality of Iowa's durational residency requirement for divorce petitions. Recognizing that "it [was] contemplated that all members of the class will be bound by the ultimate ruling on the merits," 419 U.S. at 403, 95 S.Ct. at 559, the Court first satisfied itself that the conditions of Rule 23(a) had been met. Id. As to the issue of notice in a Rule 23(b)(2) action, the Court stated in a footnote that "the problems associated with a Rule 23(b)(3) class action, which were considered by this Court last Term [in Eisen], are not present in this case." Id. at 397, n.4, 95 S.Ct. at 556.

Recognizing that the Court seems to have relied primarily on the language of the Rule rather than on constitutional grounds, a number of lower federal courts have concluded that Eisen and Sosna strongly imply that notice is not required in actions brought under subdivisions other than 23(b)(3). United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 878–79 (5th Cir. 1975) (Rules 23(b)(1) and 23(b)(2)); Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 255–57 (3d Cir.) (Rule 23(b)(2)), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); Mattern v. Weinberger, 519 F.2d 150, 157–58 (3d Cir. 1975) (Rule 23(b)(2)) (citing Wetzel, supra); Molina v. Weinberger, No. 74–1611 (9th Cir. Oct. 1, 1975), slip opinion at 11–14 (Rule 23(b)(2)); e. g., American Finance System, Inc. v. Harlow, 65 F.R.D. 94, 110–11 (D.Md.1974) (Rule 23(b)(2)). Indeed, the Second Circuit has now concluded that prejudgment notice is not required in 23(b)(2) actions, Frost v. Weinberger, 515 F.2d 57, 65 (2d Cir. 1975) (Friendly, J.), see Ives v. W. T. Grant Company, 522 F.2d 749, 764 (2d Cir. 1975), and the Seventh Circuit has indicated that its Schrader opinion will have to be reexamined in light of Eisen, Bijeol v. Benson, 513 F.2d 965, 968 n.3 (7th Cir. 1975).

Our own resolution of the due process claim in a Rule 23(b)(1) action must also

that this package would cost approximately $21,720.
Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 167, 94 S.Ct. 2140, 2147 (1974).

**43.** The Advisory Committee's Note to Rule 23 makes it clear that the Advisory Committee thought that due process required prejudgment notice in Rule 23(b)(3) cases: "[M]andatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." 39 F.R.D. 69, 106–107, citing Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) and similar cases.

It is uncertain, however, whether the Supreme Court would conclude that due process requires individual prejudgment notice. As Professor Dam has noted, "[a] close reading of Mr. Justice Powell's opinion [in Eisen] suggests that he did not want to base the notice holding on the Constitution. Yet his plain meaning methodology in interpreting the Rule

apparently does not satisfy even him. He returns time and again to due process considerations to give plausibility to his literalist interpretation of the Rule." Class Action Notice: Who Needs it?, 1974 Sup.Ct.Rev. 97, 110. For Professor Dam's discussion of the structure of the opinion in terms of its reliance on the wording of Rule 23 and on due process considerations, see id. at 109–111.

It has been persuasively argued that Mullane and similar cases do not compel the conclusion that individual notice is required in all Rule 23(b)(3) class actions. See, e. g., Note, Managing the Large Class Action: Eisen v. Carlisle & Jacquelin, 87 Harv.L.Rev. 426, 433–441 (1973). But even were the Supreme Court to conclude that due process required individual notice in Rule 23(b)(3) actions, application of the Mullane balancing approach could lead to different results with respect to Rule 23(b)(1) and 23(b)(2) actions given the different interests at stake. Indeed, the subsequent textual discussion of Sosna suggests that very conclusion.

take into account the recent decision by this court in *Childs v. United States Board of Parole,* 167 U.S.App.D.C. 268, 511 F.2d 1270 (1974). The panel in that case, citing the Supreme Court's *Eisen* decision, upheld the District Court's grant of relief to members of a Rule 23(b)(2) class despite an argument by the Government that the absence of prejudgment notice in that case violated due process. *Id.* at 1276. We think that a similar resolution of the due process issue should obtain here; the factors that have prompted courts and commentators to conclude that due process does not require notice in Rule 23(b)(2) class actions are equally applicable to actions certified under Rule 23(b)(1).[44]

Unlike the situation with respect to members of a Rule 23(b)(3) class, the members of a Rule 23(b)(1) class are likely to be more unified in the sense that there will probably be little interest on the part of individual members in controlling and directing their own separate litigation on the question at issue in the class suit. Indeed, in a Rule 23(b)(1)(B) class action, adjudications with respect to individual members would as a practical matter dispose of the interests of the absent members or substantially impair or impede their ability to protect their interests. At best, then, notice provides absent members with an opportunity to monitor the representation of their rights. In such cases, we think that due process is satisfied if the procedure adopted "fairly insures the protection of the interests of absent parties who are to be bound by it." *Hansberry v. Lee,* 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L.Ed. 22, 27 (1940). We agree with the Ninth Circuit's recent observation that "[o]nly when the purposes in providing class members an opportunity to signify whether representation by named plaintiffs is fair and adequate or to intervene to present additional claims or to otherwise come into the action to, for example, submit views as amici curiae, are in need of being served, does due process require the direction of some sort of notice to absent members" of a Rule 23(b)(1) class. *Molina v. Weinberger, supra,* slip opinion at 13 (Rule 23(b)(2)). In such cases, notice can be provided pursuant to Rule 23(d)(2).[45] Since in our view this case does not present special circumstances requiring prejudg-

---

**44.** In representative actions brought under [subdivisions other than Rule 23(b)(3)], the class generally will be more cohesive—for example, in many instances each member will be affected as a practical matter by a judgment obtained by another member if individual actions were instituted. Similarly, it is less likely that there will be special defenses or issues relating to individual members of a Rule 23(b)(1) or Rule 23(b)(2) class, than in the case of a Rule 23(b)(3) class. This means that there is less reason to be concerned about each member of the class having an opportunity to be present. Thus, in suits under subdivisions (b)(1) or (b)(2), once the court determines that the members are adequately represented as required by Rule 23(a)(4), it is reasonably certain that the named representatives will protect the absent members and give them the functional equivalent of a day in court.

In keeping with this philosophy, class members in Rule 23(b)(1) and Rule 23(b)(2) actions are not provided an opportunity by the rule to exclude themselves from the action as is true in Rule 23(b)(3) actions. Because they do not have the alternative of bringing a separate suit, notice really serves only to allow those members the opportunity to decide if they want to intervene or to monitor the representation of their rights. As a safety valve, the court is given discretion by Rule 23(d)(2) to direct notice to be given in any class action "for the protection of the members of the class or otherwise for the fair conduct of the action"—a power that is inherent in the court at least in situations having due process overtones. 7A C. Wright & A. Miller, *supra,* § 1786 at 143–44 (footnotes omitted). *See Molina v. Weinberger,* No. 74–1611 (9th Cir. Oct. 1, 1975), slip opinion at 12–13.

**45.** Rule 23(d)(2) provides:

In the conduct of actions to which this rule applies, the court may make appropriate orders: (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.

ment notice, we uphold the District Court's order certifying the class.

### C. Disclosure Under Rule 23(d)

■ Plaintiffs argue that the District Court erred in refusing to grant their request for an order directing the Government to disclose the names and addresses of the members of the plaintiff class. Having considered the context in which this request was made, we cannot conclude that the District Court abused its discretion in refusing to issue a Rule 23(d) order.

On May 8, 1973 the attorneys for the named plaintiffs wrote to the United States Attorney's Office stating that "it would be helpful for the Court and plaintiffs if the U.S. Navy were to prepare a list of the names and locations of the plaintiffs [sic] class so that we would be in a position upon Court ruling to notify those members of the class." The United States Attorney did not respond favorably to the request. Plaintiffs apparently first mentioned the disclosure issue to the District Court in their opposition to the Government's initial motion for an extension of time in which to respond to the motion to confirm the class. In their written opposition, plaintiffs mentioned their correspondence with the Government, but failed to request a Rule 23(d) order.

As noted earlier, the Government filed a second motion for an extension of time in which to respond to plaintiffs' motion to confirm the class, and it was in their written opposition to that motion that plaintiffs formally requested an order requiring the Government to disclose the names and addresses of the class members. No reasons were offered to support that request; plaintiffs simply asked for a disclosure order "in addition" to a requested order fining the Government $500 per day per plaintiff for its continued delay in filing responsive papers.

The judgment entered by the District Court complied in all respects with Rule 23(c) in that it described the members of the plaintiff class. Absent some articulation of the reasons why plaintiffs thought a disclosure order would be necessary to protect the interests of absent class members, the District Court certainly cannot be said to have abused its discretion in denying the requested order.

### IV. ATTORNEYS' FEES

■ Plaintiffs' counsel asked the District Court to award them attorneys' fees in the amount of $175,000, approximately 25% of their estimate of the total class recovery. The District Court chose not to follow a percentage of recovery approach and instead relied on the standards for computing attorneys' fees that it had fashioned in *Kiser v. Miller,* 364 F.Supp. 1311 (D.D.C.1973). Application of the District Court's *Kiser* approach to this case produced an award of $14,729. Shortly after appellate briefs in this case were filed, this court approved the approach which the District Court had taken in *Kiser. Kiser v. Huge,* 170 U.S.App. D.C. 407, at 423–426, 517 F.2d 1237, at 1253–1256 (D.C.Cir. 1974); 517 F.2d at 1289–93.[46] Recognizing here, as we did in *Kiser,* that "we must pay considerable deference to the District Court's exercise of equitable discretion in setting [attorneys'] fees," at 423, 517 F.2d at 1253; 517 F.2d at 1289, we cannot say that the District Court's evaluation of the relevant factors produced an unreasonable, albeit quite modest, award.

The District Court properly withheld calculation of that portion of the attorneys' fees award dealing with the efforts of counsel directed at this appeal, *see Kiser, supra,* at 425–426, 517 F.2d at 1255–1256; 517 F.2d at 1292, and we therefore remand the case to the District Court for a determination with respect to that question.

*It is so ordered.*

---

**46.** This court granted rehearing en banc on October 2, 1974, but eventually reinstated that portion of the panel opinion dealing with the attorneys' fees issue. *Pete v. UMWA Welfare & Retirement Fund,* 171 U.S.App.D.C. 1, 517 F.2d 1275, 1279, 1289–93 (1975).

**1188**

## ON PETITION FOR REHEARING

Upon consideration of defendants appellants-cross appellees' petition for rehearing, it is

ORDERED by the Court that the aforesaid petition for rehearing is denied.

Statement of Circuit Judge McGowan, joined in by Senior Circuit Judge Rives and Circuit Judge Wright, as to why they voted to deny rehearing.

The Government has filed a petition for rehearing and a suggestion for rehearing *en banc* on the grounds that: (1) the panel opinion "conflict[s] with prior decisions of this Court and with decisions of the Supreme Court holding that public benefits such as the variable reenlistment bonus can never be the subject of 'contract rights' and in the discretion of Congress may be reduced or terminated at any time before they are received"; and (2) the panel opinion "has unduly restricted the paramount powers of Congress, has disregarded a clear declaration of congressional purpose, and has significantly restricted the scope of an important constitutional grant of power" in ruling that Congress was not free to abrogate existing contract rights to the VRB. Because we are of the view that neither statement accurately reflects the scope of the panel decision, we deny the petition for rehearing.

Before discussing the three primary contentions pressed upon us by the Government, we note that the petition for rehearing focuses only on named plaintiff Johnson and other members of the class who began serving their periods of extended service after the *effective* date of the 1974 statute repealing the Variable Reenlistment Bonus system.[1] Admittedly, the Government does seek a reexamination of the other issues to insure a consistent result among all plaintiffs, but the primary emphasis in the petition is on the disposition of the case given the 1974 repeal of the statute, which is discussed at Part II. C. of the panel opinion.

### I

The Government first argues that named plaintiff Johnson had no contract right to a VRB award since "the very nature of the statute . . . which authorized the VRB was such as to prevent the VRB from ever becoming the subject of a 'contractual entitlement' ".[2] Petition at 11. The Government takes the position that the VRB is a "gratuity" which may be altered or repudiated at any time. Our problem with this approach is that it fails to address the narrow issue in the case; the question is not whether a VRB can under some circumstances be considered a gratuity, but whether it ripened to a contract right under the circumstances presented in this record. To be sure, in some contexts, reenlistment bonus awards are "gratuities"; the panel does not, and indeed would not, take the position that once having established a VRB award system the Congress cannot terminate it. As to those enlisted personnel who

---

1. We think it appropriate to note why the panel "decided to rule on the effect of the new Act on plaintiff Johnson, even though it acknowledged that the matter had not been raised (and had not been briefed or argued)." Petition at 6. The panel reached the issue precisely because it had no other choice; one of the named plaintiffs had entered into his period of extension *after* the repeal of the statute authorizing the VRB system, and consequently the panel had to satisfy itself that the affirmance of the District Court's grant of relief as to Johnson and others similarly situated was not barred by the subsequent statutory change. The panel purposefully noted in the opinion that the issue had not been raised to highlight the fact that at no time in the course of this appeal did the parties notify the court of the repeal of the authorizing statute.

2. We find somewhat disconcerting the Government's statement that the panel opinion "does not identify the source" of the contractual entitlement to a VRB, and that as a result the Government has had to assume that the contractual entitlement finding is based on the language in the extension agreements promising the named plaintiffs such "pay" as would accrue to them during their periods of extended service. Petition at 7. As footnote 23 of the panel opinion expressly notes, the Government conceded in its brief that the term "pay" in the extension agreements includes VRB awards, and we reject any new suggestion to the contrary in the petition for rehearing.

were planning to reenlist but who took no binding action in that regard prior to the effective date of the repeal, the VRB is a "gratuity" rather than a contract right. This point is illustrated by *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), which concerned congressional action on June 21 of 1938 suspending for the fiscal year July 1, 1938 to June 30, 1939 a statutorily authorized reenlistment bonus. Dickerson was discharged on July 21, 1938 and reenlisted the very next day. His expectation that he would receive a bonus upon reenlistment did not confer a contractual right to those benefits, and the Court held that he was covered by the congressional action on June 21 prospectively suspending the reenlistment bonus.[3]

But we do not read *Dickerson* to mean that one can never claim a contract right to a benefit which in some contexts has been accurately labeled a gratuity. That just the opposite is true is illustrated by the Supreme Court cases cited by the Government dealing with changes in the salaries of Government officials. For example, in *Fisk v. Jefferson Police Jury* the Supreme Court noted:

**3.** To the same effect are *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) and *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), two cases with which the panel opinion allegedly conflicts. In *Belcher,* the plaintiff was receiving social security disability benefits of approximately $330 per month when Congress amended the Social Security law to require a reduction in benefits to reflect receipt of state workmen's compensation benefits. As a result of the amendment, the plaintiff's disability benefits were reduced to approximately $225 per month. The Court expressly noted that "an expectation of public benefits [does not] confer a contractual right to receive the expected amounts." 404 U.S. at 80, 92 S.Ct. at 257, 30 L.Ed.2d at 234. In *Flemming,* the plaintiff's old age benefits were terminated, as required by statute, when he was deported. The Court there noted: "[E]ach worker's benefits, though flowing from the contributions he made to the national economy while actively employed, are not dependent on the degree to which he was called upon to support the system by taxation. *It is apparent that the noncontractual interest of an employee covered by the Act cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments.*" 363 U.S. at 609–10, 80

[T]hough when appointed the law has provided a fixed compensation for his services, there is no contract which forbids the legislature or other proper authority to change the rate of compensation for salary or services after the change is made, though this may include a part of the term of the office then unexpired. *Butler v. Pennsylvania,* 10 How. 402, 13 L.Ed. 472.

But after the services have been rendered, under a law, resolution, or ordinance which fixes the rate of compensation, there arises an implied contract to pay for the services at that rate. This contract is a completed contract.

116 U.S. 131, 133–34, 29 L.Ed. 587, 588 (1885).

The salary cases indicate that once someone agrees to perform certain services in exchange for a given sum of money, and the Government has received that performance—or, as in this case, insists on receiving it [4]—the case is different; the "gratuity" becomes a contractual right.[5]

S.Ct. at 1372, 4 L.Ed.2d at 1443 (emphasis added). Named plaintiff Johnson's right to the benefit of a VRB is bottomed on his contractual obligation to serve his country for an additional two years, and the VRB award depended directly on his willingness to sign an agreement to extend his service.

The other "gratuity" cases relied on by the Government resemble *Belcher* and *Flemming,* rather than the case of the holder of an annuity. *See, e. g., Thompson v. Gleason,* 115 U.S. App.D.C. 201, 317 F.2d 90, 96 (1962) (disability benefits); *Barnett v. Hines,* 70 U.S.App.D.C. 217, 105 F.2d 96, *cert. denied,* 308 U.S. 573, 60 S.Ct. 88, 84 L.Ed. 480 (1939) (retirement pay).

**4.** Plaintiff Johnson's situation differs in one important respect from that of the Government officials in the salary cases: he is not free to leave his job. *Compare Embry v. United States,* 100 U.S. 680, 685, 25 L.Ed. 772, 773 (1879) ("If an officer is not satisfied with what the law gives him for his services, he may resign."). Consequently, the crucial factor concerning contractual entitlement is not whether named plaintiff Johnson has fully served his two year extension, but whether he is required to do so.

**5.** In this regard, the Government's citation of Hochman, *The Supreme Court and the Consti-*

Thus, our conclusion with respect to the "gratuity" versus "contract right" issue is that mere labels are neither helpful nor determinative. The issue is not whether a given claim to money resembles a "gratuity" in benevolent purpose, but whether the claim *sub judice* differs from a gratuity fundamentally in legal incidents. *See Lynch v. United States,* 292 U.S. 571, 576–77, 54 S.Ct. 840, 842, 78 L.Ed. 1434, 1438 (1934). Here, unlike the social security and other gratuity cases relied on by the Government, there is an agreement between the parties and the plaintiffs have undertaken a serious commitment in order to acquire the right to a VRB, namely, the promise to spend an additional two years in military service. The Government now seeks to enforce the promise to serve and at the same time label the promise it offered in return a mere gratuity. The cases relied on by the Government do not justify that result.[6]

## II

The Government raises a second but equally unpersuasive argument as to why named plaintiff Johnson did not have a contract right to a VRB award, namely, that enlisted documents must be construed to incorporate not only the statutes in force at the time the agreement is signed but future changes in those statutes as well. Petition at 8. The Government's point on this issue is certainly accurate as to regular pay for enlistees, and cases such as *Johnson v. Powell,* 414 F.2d 1060 (5th Cir. 1969), indicate that the Government's point has broad applicability. But this does not mean that Congress is without authority to decide to promise a specific sum, rather than an uncertain sum, to achieve a given result, and this is precisely how the panel interpreted the extension agreement. Our review of the legislative history—which is clear—and the regulations—which at times are ambiguous—led us to conclude that Congress intended—and the regulations provided—a promise to pay a specific sum (in the form of a VRB) not dependent on future change.

As we read the petition, the Government does not argue that Congress is without power to establish a VRB scheme not dependent on future change. Instead, it argues that the contract for a VRB is like the normal contract for military pay—that is, a contract which anticipates future changes.

*tutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692 (1960) is slightly misleading. The Government quotes Hochman's statement that gratuities "may be altered or repudiated at any time until the benefits conferred by them are actually received." *Id.* at 724. But Hochman goes on to note that the "key element" with respect to whether a benefit is a gratuity appears to be "the absence of any financial cost in the acquisition of the right based upon the original statute." *Id.* at 725. Hochman argues that:

It should be stressed that the reliance required to remove a right from the category of gratuity . . . is a financial detriment in the acquisition of the right, and not merely reliance on the right after it accrues, as, for example, the making of a financial commitment in reliance upon the statute. The reason for this stricter requirement is probably similar to that encountered in the cases sustaining the extension of statutes of limitation; the . . . gratuity is given by a statute for public purposes which are not controlled by the merits of the donee's claim to the

right. Under these circumstances, the Court is reluctant to permit the donee to obstruct a reassessment of these purposes by the legislature.

*Id.* at 726 (footnote omitted). We would find it difficult to conclude that there was no financial cost in the acquisition of the right to a VRB or that the right to a VRB is not controlled by the merits of the enlisted person's claim—namely, willingness to extend his period of service.

**6.** The Government did not press this gratuity argument in its initial brief. The reason for that may be that as to the other named plaintiffs who began serving their extensions prior to the effective date of the repeal, the termination of the alleged "gratuity" was achieved by military regulation rather than by statute. *See Carini v. United States,* 528 F.2d 738, 741 n. 7 (4th Cir. 1975). But if the Government is of the view that only Congress could terminate the "gratuity," we fail to see how a reexamination of the issues with respect to the named plaintiffs other than Johnson would produce a consistent result. *See* Petition at 15.

But that is simply to say that the Government disagrees with the panel's interpretation of the contract; the argument was considered and rejected by the panel, and mere disagreement with the result does not warrant rehearing.

We stress that this is the only point on which we are in conflict with the Fourth Circuit. In *Carini v. United States*, 528 F.2d 738 (1975), that court took the position that the contract at issue anticipated possible statutory change, a result reached without analysis of the legislative history or applicable regulations. Moreover, as we indicated at footnote 35 in the panel opinion, all four district courts ruling on the issue disagree with the approach taken by the Fourth Circuit.[7]

### III

The final argument raised by the Government is that even if named plaintiff Johnson had a contractual right to a VRB award, Congress was exercising a paramount power in repealing the statute and thus under *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), was constitutionally free to abrogate existing contract rights.[8] The Government agrees with the panel's view that there was a fiscal purpose behind the Act, but maintains that "the Act represents a legitimate exercise of Congress' paramount power to 'raise and support armies' and 'to make rules for the government and regulation of the land and naval forces.'" Petition at 15. This is so because "the purpose of the Act was to provide the Defense Department with the recruitment tools it needed to fill critical skill needs in the new All-Volunteer Force." *Id.* at 14. The Government's analysis of the legislative history indicates that the military departments found two deficiencies in the then effective bonus scheme: the authorization of a regular, as opposed to variable, reenlistment bonus without regard to speciality; and the failure to provide a VRB for reenlistments subsequent to the first reenlistment.

We have no disagreement with the Government's assessment of these purposes, but the determinative factor is that they have nothing to do with enlisted personnel who had already agreed to extend their enlistments before Congress repealed the prior statute. The purposes identified by the Government speak in prospective terms and are completely unrelated to men who had already agreed to serve the additional two years; as a result, they cannot be used to justify a change in the terms of already binding extension agreements.

---

7. The Fourth Circuit itself was not pleased with the result it felt obliged to reach: "While we hold there is no enforceable contract right to the payment of the VRBs under the now repealed § 308(g), the situation of these plaintiffs is most appealing. . . . Under the circumstances, the Congress may wish to reconsider their situation and the moral claims they have against the United States." 528 F.2d at 741–42.

8. The Government maintains that it is not clear that *Lynch* sets the correct standard, but nevertheless appears to be willing to concede for purposes of this appeal that the *Lynch* standard applies. Petition at 13 & n. 9. Whether *Lynch* requires the exercise of a paramount power or something less—whatever that may be—it is clear that abrogation of contract rights for the sole purpose of reducing expenditures is not constitutionally sanctioned. Since in our view that is the only justification for *retroactive* termination as to named plaintiff Johnson, we need not rehear the case to consider the issue of the outer limits of the *Lynch* doctrine.