**ACACIA VILLA, A California Partnership, et al.,
Plaintiffs,**

v.

**Jack KEMP, et al., Defendants.**

**No. CV 90–390 MRP.**

United States District Court,
C.D. California.

Oct. 31, 1990.

Molly Munger, Kevin P. Hall, Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, Cal., Henry A. Hubschman, John F. Coverdale, Lori A. Martin, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for plaintiffs.

Jan Luymes, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

PFAELZER, District Judge.

The Court having read and considered all the papers filed in support of and in opposition to the plaintiffs' motions for partial summary judgment and defendants' motion for summary judgment has concluded that:

### I. *Background*

Plaintiffs are private developers who, between 1974 and 1988, entered into long term contracts with the Department of Housing and Urban Development ("HUD") to provide low-income rental housing. These contracts, known as Housing Assistance Payments ("HAP") contracts, were entered into pursuant to Section 8 of the Housing Act of 1937, as amended, 42 U.S.C. § 1437f ("Section 8"). Section 8 provides rent subsidies to low income families. Those families pay rent based upon a percentage of their income, and the federal government pays the difference between the tenant's contribution and the contract rent of the unit directly to the developer. The contract rent—the maximum monthly rent to which the project owner is entitled—is based upon the original rent specified in the HAP contract, adjusted at least annually to reflect changes in fair market rentals. Prior to its amendment in 1988, Section 8 authorized the Secretary to adjust rents by either of two methods: the formula method, under which the new contract rent would be determined by multiplying the existing contract rent by an "Automatic Annual Adjustment Factor" ("AAAF") published in the Federal Register, or the "comparability study" method, under which adjustments would be based on market surveys of comparable unassisted units.

Plaintiffs claim that under their HAP contracts application of the AAAF formula was expressly selected as the procedure for calculating rent adjustments, and that HUD has breached its contract by failing to make rent adjustment payments according to that formula since 1983. In 1988, the Ninth Circuit held, in *Rainier View Associates v. United States*, 848 F.2d 988 (9th Cir.1988) *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989), that contract language identical to the language in plaintiffs' contracts bound HUD to calculate rent adjustments according to the published AAAF formula.[1] *Rainier*, 848 F.2d at 991.

HUD applied for but was denied certiorari in *Rainier* in 1989. Presumably to avoid a flood of litigation, HUD sent a letter to Section 8 project owners in the Ninth Circuit stating that it would comply with *Rainier*, and apply the AAAF method both retroactively and prospectively to all project owners who could sue in the Ninth Circuit without requiring them to file complaints.

Before HUD took action to comply with this policy, the Congress passed the HUD Reform Act of 1989, Pub.L. No. 101–235, § 801, 103 Stat. 2058, December 15, 1989 ("§ 801"), which prescribes a new method for computing rent adjustments. The statute establishes one procedure for recalculating past adjustments and a different procedure for determining future adjustments.

Section 801's retroactive provisions mandate recalculation of past rent adjustments where use of comparability studies did not raise rents to the level permitted by the

---

**1.** The *Rainier* court rejected the argument that an overall limitation provision in the contracts, providing that the rent adjustments could not result in material differences between rents charged for Section 8 units and comparable unassisted units, provided an independent basis for resorting to comparability studies. The overall limitation provision states that "notwithstanding any other provisions of this Contract, adjustments ... shall not result in material differences between rents charged for assisted and

comparable unassisted units, as determined by the Government; provided that this limitation shall not be construed to prohibit differences in rents ... to the extent that such differences may have existed with respect to initial Contract Rents." The court interpreted that language as a limitation on calculation of the formula rather than as an independent basis for making rent adjustments according to comparability surveys. *Rainier*, 848 F.2d at 991.

AAAF method.[2] But § 801 does not adopt the traditional AAAF method to make this recalculation. Instead of applying the published AAAF formula to the full existing contract rent to determine the proper adjustment, § 801 applies the formula to a different amount—the portion of the existing rent which is not attributable to debt service. This obviously would result in a smaller increase than under the traditional AAAF method. Congress did, however, establish a floor in the new statute to ensure that the monthly adjustment would not be too small. Under § 801, developers are entitled to at least 30% of what they would have received if the AAAF had been applied to the entire existing contract rent each time an adjustment was made.

Plaintiffs contend that debt service represents between 17.8% and 66.1% of the monthly rental payment depending on the project. Therefore, plaintiffs argue, most developers will receive the 30% minimum under § 801. HUD does not seem to dispute that this will, in fact, be the result. Adjustments are to be paid over a period of three years, without interest. Plaintiffs contend that the § 801 recalculation deprives them of the full rent adjustments to which they are entitled under their HAP contracts.

The prospective provisions of § 801 authorize future rent adjustments to be made in one of three ways, depending upon the circumstances: 1) Application of the AAAF to the existing contract rent; 2) Where the AAAF would result in material differences between rents charged for comparable assisted and unassisted units, a Modified Annual Adjustment Factor ("MAAF") may be applied. The MAAF is determined by studying rents in a geographical area smaller than that used to calculate the AAAF; 3) Where the MAAF also results in material differences, § 801 authorizes the use of comparability studies, conducted in accordance with new regulations to be established by the Secretary of HUD.

Project owners may request a one-time determination of contract rent to serve as the basis for future rent adjustments. The new contract rent will be the greater of the contract rent currently approved by the Secretary of HUD (unaffected by the recalculation in accordance with the retroactive provisions of § 801) or the contract rent as calculated under the retroactive provisions.[3] If the project owner makes no such request, the basis will be the currently approved contract rent. Plaintiffs argue that, regardless of which method of measuring future rent adjustments is applied to them, they necessarily are deprived of the full adjustments to which they are entitled under the HAP contracts.

Plaintiffs seek declaratory relief based upon breach of contract, violations of the Administrative Procedure Act, the Housing Act, HUD regulations and several provisions of the Constitution, including the Due Process Clause, the Takings Clause, and the Section Four of the Fourteenth Amendment. The defendants ("HUD" or "the government") invoke § 801 as a defense to all these claims. Plaintiffs argue that § 801 is unconstitutional, and therefore is no defense.

Plaintiffs' Motion for Partial Summary Judgment seeks summary judgment as to Count I, the breach of contract claim, anticipates HUD's invocation of § 801 and argues that it is unconstitutional. After the filing of this motion, plaintiffs filed an amended complaint, adding Count X, which alleges that § 801 violates the plaintiffs' due process rights, effects a taking without just compensation, and is an unconstitutional questioning of the public debt. The subsequent Motion for Partial Summary Judgment as to Count X addresses issues already discussed in the earlier motion, except that they are framed as affirmative claims rather than as arguments raised in anticipation of defendant's defense. HUD's Motion for Summary Judgment

---

**2.** The retroactive provisions apply for Fiscal Year 1980 until the regulations governing future rent adjustments under § 801 go into effect.

**3.** That is, the contract rent that would be in effect had the AAAF been applied all along to a base rent equal to the contract rent less the amount of the contract rent attributable to debt service.

takes the position that § 801 moots plaintiffs' claims, that this court does not have jurisdiction to review the constitutionality of § 801 and that, in any event, § 801 is constitutional.

## II. Discussion

### A. Mootness of Plaintiffs' Claims

HUD argues that plaintiffs' breach of contract claim is mooted by § 801 because § 801 provides an exclusive method for calculating past and future contract rents and rent adjustments. However, defendants at the same time concede that the challenge to the constitutionality of § 801 is not moot. The cases cited by defendant for the proposition that intervening legislation or clarifying amendments to legislation may moot a controversy by removing the basis for the plaintiff's claim did not involve new legislation whose constitutionality was being questioned. *See, e.g., Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414–15, 92 S.Ct. 574, 575–76, 30 L.Ed.2d 567 (1972) (per curiam) (challenge to tax exemption for church parking lot mooted by repeal of the exemption where validity of the repealing legislation was not contested); *U.S. Dept. of Justice v. Provenzano*, 469 U.S. 14, 15, 105 S.Ct. 413, 414, 83 L.Ed.2d 242 (1984) (issue under Freedom of Information Act mooted by intervening legislation where validity of the intervening legislation was not challenged). Section 801 cannot be used as a basis for mooting any claims until the threshold question of its constitutionality is addressed.

### B. Ripeness of the Takings Claim

The Court agrees with HUD that the takings claims are premature because plaintiffs must first avail themselves of the process provided by the Tucker Act. The Fifth Amendment does not preclude the government from taking private property; it only prevents taking without just compensation. A property owner has no claim for a taking where there is an adequate process for obtaining compensation, and that process yields just compensation. Thus, takings claims against the federal government are not ripe until the property owner has first sought and been denied just compensation through the Tucker Act process. *Preseault v. I.C.C.*, 494 U.S. 1, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (even if "rails-to trails" statute gave rise to a taking, the requirements of the Fifth Amendment were satisfied since compensation was available through the Tucker Act); *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195–96, 105 S.Ct. 3108, 3121–22, 87 L.Ed.2d 126 (1985) (takings claims based on a zoning ordinance not ripe until plaintiff has been denied compensation through state's reverse condemnation process). In order to pursue a Tucker Act remedy in this court, plaintiffs would have to establish Little Tucker Act jurisdiction, which they have failed to do. Defendant, therefore, contends that the Claims Court has exclusive jurisdiction.

Plaintiffs respond with two arguments. First, they argue that a suit for denial of just compensation is not a prerequisite for takings claims involving deprivations of money as opposed to real property or other non-fungible goods. However, the cases cited by plaintiff for this proposition do not support it. *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), is not a suit against the federal government. The other case cited by plaintiffs, *Fern v. United States*, 908 F.2d 955, 958 (Fed.Cir.1990), states only that where a Tucker Act remedy is inadequate, voiding of the statute in question or some other relief may be appropriate. It does not suggest that the plaintiff may, in such cases, dispense with the Tucker Act procedure.

Plaintiffs' second argument is that Little Tucker Act jurisdiction need not be shown because they are seeking declaratory relief, rather than pecuniary damages. However, the principles of *Preseault* apply even where plaintiff is seeking declaratory relief. Indeed, the plaintiffs in *Preseault* whose claims were dismissed for being unripe were themselves seeking a declaration that the statute in question effected a taking, in violation of the Constitution. *Pre-*

*seault, supra,* 110 S.Ct. at 918. The issue here is the same issue that was decided in *Preseault;* this Court cannot find that a statute effects an unconstitutional taking before plaintiffs have sought and been denied just compensation. If the Tucker Act remedy proves inadequate in addressing plaintiff's prospective claims, plaintiffs may be entitled to return to the district court, but *Preseault* requires that they seek just compensation first.

■ Plaintiffs' retroactive claims could arguably be heard if § 801 were construed as having withdrawn the Tucker Act remedy as to those claims; but for the reasons stated below, the Court finds that § 801 cannot be so construed. The statute describes the formula under § 801 as the "exclusive method" for calculating past rent adjustments. The Supreme Court, however, has held that a Tucker Act remedy always exists unless the statute unambiguously withdraws that remedy. *Preseault, supra,* 110 S.Ct. at 922–23. Provisions precluding any payments under an act without prior appropriation have been construed not to preclude a Tucker Act remedy. *Id.* at 922. Given this strong presumption against finding that the Tucker Act remedy has been withdrawn and the fact that § 801 makes no mention of the Tucker Act, the Court concludes that Tucker Act jurisdiction still exists. The takings claim cannot be adjudicated at this time.

C. Ripeness of the Due Process Claims

■ HUD makes two arguments with respect the ripeness of the due process claim. First, HUD argues that the due process claims must also be heard in Claims Court. The Court disagrees. The remedy for a violation of due process is not "just compensation" but "invalidation of the regulation [or statute] and if authorized and appropriate, actual damages." *Williamson, supra,* 473 U.S. at 197, 105 S.Ct. at 3122. *Williamson* does not support the proposition that where a takings claim must be heard in the Claims Court, the parallel due process claim must be heard along with it. The plaintiffs in *Williamson* claimed that a county zoning ordinance

effected an unconstitutional taking and violated their due process rights. The *Williamson* court concluded that the takings claims in that case were unripe both because the plaintiff had not first sought a variance in the ordinance and because the plaintiff had failed to seek just compensation through the state's reverse condemnation procedures. The unripeness of the due process claim was founded only upon the former issue. *Id.* at 199–200, 105 S.Ct. at 3123–3124. There was no indication that the court considered the two claims inseparable. District courts have reached the merits on due process claims that, like the claims here, involved actions that could also have been characterized as takings. Those courts did not even address whether the due process claim should be heard in the claims court. *Orrego v. U.S. Dept. of Housing and Urban Development,* 701 F.Supp. 1384 (N.D.Ill.1988) (due process challenge to the Emergency Preservation Act on ground that it impairs the federal government's obligations rejected on its merits); *Larionoff v. United States,* 533 F.2d 1167, 1180 (D.C.Cir.1976), *aff'd.* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (legislation retroactively denying reenlistment bonuses to which plaintiffs had a contractual right found unconstitutional). In *Alpine Ridge v. Kemp,* a suit brought by Section 8 project owners in the Western District of Washington raising an identical due process challenge to § 801, Judge Rothstein reached the merits without addressing this issue. *Alpine Ridge,* 764 F.Supp. 1393, Order Granting Plaintiffs' Motion for Summary Judgment (W.D.Wash., Sept. 20, 1990).

■ HUD's second argument is that plaintiffs' prospective claims are not ripe because it is not yet known how § 801 will affect each individual project. HUD points out that § 801 does not specify how or when comparability studies, the MAAF or AAAF will be used, and implementing regulations have not yet been issued. While HUD is correct that the precise effect of § 801 is unknown, disposition of plaintiffs' motion does not depend on those facts. Plaintiffs' position is that § 801 *necessarily* deprives them of their right to future

rent increases as provided in their contracts, no matter what the regulations provide. The Court agrees with plaintiffs that § 801, to the extent that it authorizes the use of the AAAF or MAAF, locks the project owners into a base rent that is lower than what would have been the base rent had the AAAF been used all along. The use of the depressed base rent in calculating future rent adjustments means that those adjustments will necessarily be lower than they would otherwise have been. Insofar as it authorizes the use comparability studies, § 801 deprives them of their right to have the adjustments calculated according to a formula, as provided in the HAP contracts. Plaintiffs are seeking declaratory relief that such a deprivation is unconstitutional, and there is no need to wait until the precise amount of the loss can be calculated before granting such relief. *See Alpine Ridge, supra,* at 1397. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pacific Gas & Electric Co. v. Energy Resources Conservation & Development Comm'n.,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1721, 75 L.Ed.2d 752 (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), cited by defendant, is inapposite. The Court in *Pennell* held that a challenge to a tenant hardship provision of a San Jose rent control statute was premature where the provision gave the Hearing Officer absolute control over when and whether to apply the provision and there was no evidence that the clause had ever been applied. In contrast with the *Acacia Villa* plaintiffs, plaintiffs in *Pennell* failed to show that injury was "certainly impending."

### D. Constitutionality of § 801

#### 1. *Property Right*

■ The threshold question for the due process claim is whether plaintiffs' contractual right to the AAAF adjustments is "property" that is protected by the Constitution. The Court holds that it is. *See*

*Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (renewable term insurance policies issued under the War Risk Insurance Act are property within the meaning of the Fifth Amendment, and provision of the Economy Act cancelling them is unconstitutional); *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) (legislation abrogating federal government's obligation to pay principal and interest on certain bonds in gold coin found unconstitutional).

Defendants argue that *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986), is indistinguishable from this case and requires summary judgment in their favor. The Supreme Court in *Bowen* upheld the constitutionality of the Social Security Amendments of 1983. Those amendments took away the right of states to withdraw state and local government employees from the Social Security System. The right to terminate was expressly given in the contracts made pursuant to § 418, which authorized the voluntary participation of states in the Social Security System. In the mid-1970s, an alarming number of state entities began to terminate coverage. Congress concluded that these withdrawals threatened the integrity of the Social Security System. Congress therefore amended § 418 to eliminate the right of withdrawal.

Congress had expressly reserved, in the statute, a right to "repeal, alter, or amend" the act at any time. The Court held that the effect of the reservation was to put the states on notice that "Congress retained the power to amend the law under which the Agreement was executed and by amending that law, to alter the Agreement itself." 477 U.S. at 54, 106 S.Ct. at 2397. The Court observed that the § 418 Agreement provided that its terms were "in conformity with" § 418, and that § 418 was "fully subject" to Congress' reserved power of amendment. *Id.* The Court recognized that Congress' reserved power does not permit it to repudiate its own debts, which constitute "property" of the lender,

"in order to save money." *Id.* at 55, 106 S.Ct. at 2398.

The *Bowen* Court found that the contractual right to the termination clause was not property within the meaning of the 5th Amendment. The Court noted that the termination language in the agreements tracked the language of that section, conferring no right beyond that contained in § 418 itself. *Id.* The Court distinguished *Perry*, noting that the provision did not constitute a debt of the United States, and *Lynch*, on the ground that it was not an "obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium." *Id.* The court also considered significant the fact the clause was not unique to the agreement or a term over which the states had bargaining power. *Id.*

*Acacia Villa* falls into the category of cases that the *Bowen* Court was careful to distinguish. *Alpine Ridge, supra,* at 1400. The plaintiffs' contracts are not gratuities; rather, they are bargained-for agreements, for which plaintiffs paid valuable consideration—they have built and maintained low-income housing in accordance with HUD's requirements. The contracts stated that they were backed by the "full faith and credit" of the United States. They are obligations of the United States, similar to those created in *Perry* and *Lynch*. Unlike the contracts in *Bowen*, the contract language here does not mirror the statute and was given a different construction from the statutory language. The HAP contracts, as interpreted in *Rainier*, give plaintiffs rights beyond the provisions of the authorizing legislation—they give plaintiffs a right to the calculation of rent adjustments according to the AAAF formula even though the authorizing legislation gave them no such right.

■ HUD argues that principles of sovereignty and interpretation of contracts require the Court to conclude that the HAP contracts never gave plaintiffs a right to AAAF payments. HUD is correct that Congress' failure to reserve the right to amend the Section 8 program does not preclude it from subsequently amending it.

*Bowen* made it clear that the absence of an express statement of right to amend does not constitute a waiver. The "sovereign's power to enact subsequent legislation affecting its own contractual arrangements endures, albeit with some limitations, unless 'surrendered in unmistakable terms.'" *Peterson v. U.S. Dept. of Interior,* 899 F.2d 799, 808 (9th Cir.1990) quoting *Bowen, supra,* 477 U.S. at 52, 106 S.Ct. at 2397. The Ninth Circuit in *Peterson* held that where there is no express reservation, a court must examine the contracts made pursuant to the statute to see whether Congress "surrendered in clear and absolute language" the right to amend. *Id.*

■ Two central principles govern the interpretation of government contracts. First, government contracts should be construed, wherever possible to avoid foreclosing the exercise of sovereign power. *Bowen,* 477 U.S. at 52, 106 S.Ct. at 2396. Second, such contracts should be construed consistently with the legislative scheme that authorized them. *F.H.A. v. The Darlington,* 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958).

*Darlington* involved a corporation that obtained federally subsidized mortgage insurance provided under § 608 of the National Housing Act in 1949. The statute was enacted to provide housing for World War II veterans and their families. The contract had no explicit provision with respect to the right to rent to transients. In 1954, Congress enacted legislation providing that § 608 was intended to exclude transients while the mortgage remained outstanding. The Court stated that while subsequent legislation is "not conclusive in determining what the previous Congress meant ... [it] is entitled to weight when it comes to the problem of construction." *Id.* at 90, 79 S.Ct. at 145. Taking into account the subsequent legislation, as well the language of the original statute and accompanying regulations, the court concluded that the statute in fact intended to exclude transients, and that the contracts, absent controlling language, should be read consistently with that intent. *Id.*

The Ninth Circuit in *Peterson* applied the principles propounded in *Bowen* and *Darlington* to water contracts authorized under the Reclamation Act. Under those contracts, between the Department of Interior's Bureau of Reclamation and public water agencies in California, the federal government agreed to provide water to those districts at a subsidized rate. The court found that among the purposes of the Reclamation Act were the creation of family-sized farms and wide distribution of the water subsidy. To further those goals, Congress excluded from the subsidy tracts of more than 160 acres in the possession of a single owner. The Court concluded that the contracts did not contain an implied right to provide water to leased land, where such an implied right would allow the water districts to undermine the 160 acre limitation contrary to the purpose of the authorizing legislation. *Peterson*, 899 F.2d 799.

HUD argues that if this court applies the analysis of *Darlington* and *Peterson* to the instant case, it will be required to conclude that the HAP contracts never gave plaintiffs a right to the AAAF payments. In effect, HUD is arguing that *Rainier* was wrongly decided and that § 801 is evidence of earlier Congressional intent with respect to that issue. The Court disagrees.

The *Rainier* decision acknowledges that the Housing Act upon which the HAP contracts are based gave HUD the option of making rent adjustments according to comparability studies. It holds, nevertheless, that the HAP contracts *explicitly* chose the AAAF formulation. 848 F.2d at 991. The courts in *Darlington* and *Peterson*, in contrast, simply refused to interpret the contracts as containing *implied* provisions that would foreclose the exercise of sovereign power. This Court is bound by the Ninth Circuit's construction.

### 2. *Due Process Analysis*

Having established that there is a property right in issue, the next step in the analysis is to decide what level of scrutiny to apply to § 801. Defendants argue that these claims are subject to rational basis review, just as any other economic legislation would be. Plaintiffs contend that § 801 is subject to heightened scrutiny. To the extent that plaintiffs' argument is based upon analogies to the Contract Clause, it must fail. The standard applicable to states under the Contract Clause is not the same as the standard applicable to the United States under the Due Process Clause. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984). On the other hand, the Supreme Court in *United States Trust Company v. New Jersey*, noted in dicta that *Perry* and *Lynch* applied a "dual standard of review" under the Due Process Clause, with heightened scrutiny applied where the federal government is charged with impairing its own obligations. 431 U.S. 1, 25 n. 25, 97 S.Ct. 1505, 1519 n. 25, 52 L.Ed.2d 92 (1977).

With the exception of *Orrego, supra*, courts faced with a challenge to legislation that abrogates a private party's vested rights under a federal government contract have not explicitly adopted either a heightened or rational basis level of scrutiny. *See Lynch, supra*, 292 U.S. at 580, 54 S.Ct. at 844; *Perry, supra*, 294 U.S. at 350–51, 55 S.Ct. at 434–35; *Larionoff, supra*, 533 F.2d at 1180; *Alpine Ridge, supra*, at 15. Most courts have not even addressed the question of what level of scrutiny applies. *See Lynch, supra*, 292 U.S. at 580, 54 S.Ct. at 844; *Perry, supra*, 294 U.S. at 350–51, 55 S.Ct. at 434–35; *Larionoff, supra*, 533 F.2d at 1180.

These courts have recognized, however, that where the federal government enacts legislation that impairs its own contracts with private parties simply to save money, such legislation is treated differently than economic legislation that might incidentally affect the rights of parties to private contracts. *See Lynch, supra*, 292 U.S. at 580, 54 S.Ct. at 844 (even in the face of the Great Depression, Congress was "without power to reduce expenditures by abrogating contractual obligations."); *Perry, supra*, 294 U.S. at 350–51, 55 S.Ct. at 435 ("Congress is authorized to pledge [the] credit [of the United States] as an assur-

ance of payment as stipulated.... To say that Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise ..."). Although *Perry* and *Lynch* are Lochner Era cases, they are still cited for the proposition that saving money is not sufficient justification for legislation that impairs federal obligations. *See e.g., Bowen, supra,* 477 U.S. at 55, 106 S.Ct. at 2398 ("Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money," citing *Perry* and *Lynch*); *United States Trust Company v. New Jersey,* 431 U.S. 1, 26 n. 25, 97 S.Ct. 1505, 1519 n. 25, 52 L.Ed.2d 92 (1977); *Larionoff, supra,* 533 F.2d 1167, 1180. *Orrego,* which explicitly adopts a rational basis test, acknowledges that even under that test, to the extent that *Perry* and *Lynch* still have force, the court has a "limited role under [those cases] ... to see whether Congress acted solely to relieve a debt in the face of a private party's vested rights." 701 F.Supp. at 1396.

The implication of *Orrego* is that saving money is not a legitimate purpose under any test. *Perry, Lynch,* and *Larionoff* could be read consistently with that analysis or instead, as having adopted a heightened level of scrutiny, as the *U.S. Trust* dicta suggests. But the court shares Judge Rothstein's view in *Alpine Ridge* that under either analysis, it is clear that § 801 must fall if it serves no other purpose than to save money. *Alpine Ridge, supra,* at 1400.

▮▮▮▮ The government offers four justifications for § 801 which it attempts to distinguish from saving money: first, avoiding excessive rents and rates of return for Section 8 projects; second, ensuring project owners a reasonable rate of return; third, remedying the inconsistent application of comparability studies; and finally, resolving disputes over the use of comparability studies to adjust Section 8 rents.

The *Orrego* court appears to have accepted the alternative justification proffered by the government without further inquiry

while the *Larionoff* court looked at the legislative history of the relevant statute to determine whether the justification advanced by the government was its actual purpose. *Orrego, supra,* 701 F.Supp. at 1396; *Larionoff, supra,* 533 F.2d at 1180. While the Court believes that the *Larionoff* court's approach is more appropriate, reference to legislative history is not essential here. HUD's justifications, on their face, do not add to plaintiff's characterization of the legislation as an effort to "fix" the *Rainier* decision and save the government hundreds of millions of dollars. The Court agrees with Judge Rothstein's analysis of those justifications in *Alpine Ridge, supra,* at 1401. The first and second justifications—avoiding excessive rates of return and ensuring a reasonable rate of return—are merely restatements of the money-saving purpose. Since the government bears the burden if the rate of return is excessive, keeping the rate of return down is about saving the government money. Phrasing these rationales in terms of rate of return to the owner rather than expenditure by the government does not change that fact. To the extent that the goal of a "reasonable" rate of return is viewed not as a limit on return but as a protection for the owners, that need is created by § 801 itself. Nor does the third justification have any substance. In the absence of § 801, the application of those studies is a violation of plaintiffs' contractual rights. The government cannot justify application of the studies on the ground that it seeks to apply them more equitably where the government had no right to apply them at all. The fourth justification, the resolution of the dispute, is little more than bootstrapping. The dispute is about the fact that the contracts have been interpreted adversely to the government by the Ninth Circuit; the government now wants to avoid paying the project owners the amount that the contracts, as so interpreted, require. Again, the government is only concerned with dollars.

The conclusion that these justifications are illusory is consistent with the legislative history of § 801. As Senator Sasser stated, the rationale for § 801 was that:

[B]y moving quickly to enact this legislation with its Ranier[sic] View 'fix,' we could save the Government hundreds of millions, if not more than a billion dollars. As we all know, at a time when budget dollars for housing are at a premium, we can scarcely afford to spend $1 billion to correct past HUD errors in the administration of its programs.

135 Cong.Rec. S16607 (daily ed. Nov. 21, 1989) (statement of Senator Sasser).

The Court recognizes that the result it reaches is contrary to the general approach that has been taken under the Due Process Clause as applied to economic legislation, but this is not ordinary economic legislation. It is, rather, legislation that deprives private individuals of vested contractual rights against the government, without serving some regulatory or social purpose beyond saving money. The government may not renege on its obligations simply because, in retrospect, it finds those obligations too expensive.

### 3. The "Questioning of the Public Debt" Claim

Plaintiffs' final claim is based upon Section Four of the Fourteenth Amendment, which provides that "[t]he validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection and rebellion, shall not be questioned." U.S. Const. amend. XIV, § 4. Neither party gives this claim much attention, and there is a dearth of case law interpreting this provision. Since the Court has already concluded that § 801 violates due process, the Court does not reach this issue.

### III. Conclusion

This Court is bound by the Ninth Circuit's construction of the HAP contracts in *Rainier View*. HUD's failure to calculate the rent adjustments according to the AAAF formula is a breach of those contracts. The Court concludes that § 801 is unconstitutional in that it deprives plaintiffs of their property right to rent adjustments as provided in the HAP contracts without due process. Since § 801 is uncon-

stitutional, it affords no defense to the breach of contract claim.

Therefore, plaintiffs' Motions for Partial Summary Judgment on Counts I and X are granted. Defendants' Motion for Summary Judgment is denied.